**SENTARA–HAMPTON GENERAL HOSPITAL, Appellant,**

v.

**Louis V. SULLIVAN, M.D., Secretary of Health and Human Services, Appellee.**

**Nos. 91–5243, 91–5348.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1992.

Decided Dec. 11, 1992.

As Amended Dec. 11, 1992.

---

Ronald N. Sutter, with whom Mary Susan Philip, was on the brief, for appellant.

Robert L. Roth, Atty., Office of Gen. Counsel, Dept. of Health and Human Services, with whom Stuart M. Gerson, Asst. Atty. Gen., and Henry R. Goldberg, Atty., Office of Gen. Counsel, Dept. of Health and Human Services, were on the brief, for appellee.

Before: MIKVA, Chief Judge, SENTELLE, and RANDOLPH, Circuit Judges.

*Glossary of Acronyms*

The following acronyms are included in this opinion:
APA—Administrative Procedure Act
FDA—Funded Depreciation Account
HCFA—Health Care Financing Administration
HHS—Health and Human Services
ICU/CCU—Intensive Care Unit/Critical Care Unit
PRM—Provider Reimbursement Manual
PRRB—Provider Reimbursement Review Board
SHGH—Sentara–Hampton General Hospital

Statement of the court filed PER CURIAM.

PER CURIAM:

Sentara–Hampton General Hospital ("SHGH" or "the Hospital") challenges the decision by the Health Care Financing Administration ("HCFA") to deny Medicare reimbursement for a portion of the interest expense SHGH incurred on a loan taken out in 1982 for capital improvements. The HCFA denied reimbursement on the grounds that $2,980,575 of the $14,675,000 loan was unnecessary, and therefore, under the Medicare Act, SHGH was not entitled to reimbursement for the interest expense incurred on the unnecessary borrowing. *See* 42 U.S.C. § 1395x(v)(1)(A). In making its decision, the HCFA relied on § 226 of the Provider Reimbursement Manual ("PRM"), issued by the Secretary of Health and Human Services ("HHS") and revised in 1983, which deems any borrowing unnecessary if the provider has funds in its funded depreciation account that are not committed by contract to a capital purpose. SHGH argues that the Administrator's application of revised PRM § 226 was illegal, since the "contractually committed" stan-

dard constitutes a legislative rule that was not promulgated with "notice and comment" as required by the Administrative Procedure Act ("APA"). 5 U.S.C. § 553. SHGH also contends that the Administrator's decision was arbitrary and capricious, and not supported by substantial evidence. 5 U.S.C. § 706(2)(A) and (E).

We commend Judge Lamberth on his thorough Memorandum Opinion and affirm the major conclusions reached therein; specifically, that the revisions to section 226 constituted interpretive rule-making for which notice and comment was not required, and that the Administrator's decision was not arbitrary and capricious. We also grant the government's cross-appeal, which slightly modifies the district court's determination of unnecessary borrowing.

## BACKGROUND

### A. Statutory and Regulatory Framework

SHGH is a non-profit acute care hospital located in Hampton, Virginia. As a provider of services under the Medicare program, SHGH is entitled to reimbursement for the reasonable cost of rendering hospital services to Medicare beneficiaries. 42 U.S.C. § 1395f(b). The term "reasonable cost" is defined under the Medicare Act as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A). Beyond this general requirement, what does and does not qualify as a reasonable cost is determined under Medicare regulations and program guidelines issued by the Secretary, including those contained in the PRM.

Reimbursement payments to providers are ordinarily made by private organizations, known as fiscal intermediaries, under contracts with the Secretary. 42 U.S.C. § 1395h; 42 C.F.R. § 421.100. Under the cost reimbursement system, the intermediary distributes to providers estimated payments during a cost reporting year. 42 C.F.R. § 413.64(a), (b) and (e). These payments are eventually adjusted, retroactively, after the intermediary audits the annual cost report filed by the provider. 42 C.F.R. §§ 413.64(a) and 405.1803. A provider may, if dissatisfied with the intermediary's determination, request a hearing before the Provider Reimbursement Review Board ("PRRB") whose decision is final unless the Secretary reverses, affirms or modifies the Board's decision. 42 U.S.C. § 1395oo(a), (d), (f)(1). The Secretary has delegated his authority to review PRRB decisions to the HCFA, the agency within HHS responsible for administering the Medicare program. 42 Fed.Reg. 13,262 (1977); 42 Fed.Reg. 57,351 (1977).

Under the Medicare regulations promulgated by the Secretary, reimbursable costs include "all necessary and proper costs incurred in furnishing the services...." 42 C.F.R. § 413.9. Thus, interest expense incurred on borrowing will be reimbursed only if "necessary and proper." Since there is no dispute in this case that SHGH's claimed interest expense was "proper," the only question here is whether the interest expense was "necessary." According to § 413.153(b)(2) of the regulations, interest expense is considered "necessary" only if it was incurred to satisfy a "financial need" of the provider.

Although generally interest expense is required to be offset against interest income, providers are allowed to deposit the reimbursement received for depreciation costs and other cash into sinking funds for capital purposes called "funded depreciation accounts" ("FDAs"). 42 C.F.R. §§ 413.134(e) and 413.153(b)(2)(iii). The interest income incurred on FDAs may be retained in full and will not be offset by interest expense. *Id.* The PRM provisions applicable to funded depreciation were originally issued in 1968, and were intended to encourage providers to save for their capital costs. PRM § 226, in its original form, described funding of depreciation as

the practice of setting aside cash, or other liquid assets, in a fund separate from the general funds of the provider to be used for replacement of the assets depreciated, or for other capital purposes. The deposits to the fund are generally in an amount equal to the depreciation ex-

pense charged into costs each year, and are in effect made from the cash generated in excess of cash expenses by the non-cash expense depreciation....

Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for replacement of depreciable assets, and coordinate their planning of capital expenditures with areawide planning activities of community and State agencies.

Section 226 also noted that contractual obligations would often limit the availability of funded depreciation for capital purposes:

Funding of depreciation by a provider may be required under the terms of a bond indenture, mortgage, or other lending agreement, in which the creditors restrict the use of such funds by the providers....

According to the Secretary, although these guidelines were designed to give providers an opportunity and incentive to save for future capital needs, HHS was also concerned about the possible misuse of the favorable treatment afforded FDAs. If providers declined to use their FDA for their capital costs, they could reap a double benefit by receiving reimbursement for their interest expense on current borrowing, while also retaining available FDA and earning protected interest. Thus, to protect the financial integrity of the Medicare program, the Secretary generally interpreted the guidelines to disallow the reimbursement of interest expense if a provider chose to borrow rather than expend or commit its FDA to a capital purpose. *See e.g. Bemidji Community Hospital,* Medicare and Medicaid Guide (CCH) ¶ 29,704 (HCFA May 4, 1979); *but cf. Research Medical Center,* Medicare and Medicaid Guide (CCH) ¶ 29,447 (HCFA Sept. 28, 1978).

In January 1983, the Secretary revised § 226 and characterized the new provision as a "clarification" of Medicare policy. The revised provision states in part:

C. Restrictions....Funds are considered available unless committed, *by virtue of contractual arrangements,* to the

acquisition of depreciable assets used to render patient care, or to other capital purposes. Borrowing for a purpose intended by funded depreciation is unnecessary to the extent funded depreciation is available. Thus, interest expense for borrowing up to the amount of available funded depreciation is not an allowable cost.

The 1983 revisions became effective upon issuance. In 1991, the underlying regulations were amended for the first time with notice and comment to codify the "contractually committed" standard in order to "remove any doubt about [its] applicability." 42 C.F.R. § 413.134(e)(2)(i).

### B. *Factual Background*

In 1979 SHGH adopted a long range capital expansion plan which designated projects for renovating and expanding the hospital facility. The largest project identified in the expansion plan was the construction of a new intensive care unit/critical care unit ("ICU/CCU"). In 1982, the Hospital was ready to begin the ICU/CCU project but was considerably short on funds. While the estimated cost of the project was $15,681,002, the Hospital only had $3,480,575 in its funded depreciation account, and at least some of those funds were intended for other purposes. For example, aside from the ICU/CCU project, the Hospital planned to use FDA funds to make a balloon payment of $1.5 million on a 1975 bond issue which would become due in 1985, and had also committed to pay $500,000 as a contingency for the ICU/CCU project. To make matters worse, SHGH projected additional capital expenditures of approximately $6.95 million for the four year period 1982–1985, and had two other projects in progress that needed to be completed. ·

Despite the huge capital improvement costs facing the Hospital, for a number of reasons SHGH wanted to retain as much of its FDA as possible. First, SHGH was experiencing a period of financial instability and was concerned that without reserve funds, the viability of the Hospital would· be threatened. Second, the Hospital's long-

term goals appeared vulnerable due to the cost containment measures proposed by Congress and the possibility that tax-exempt financing would soon be unavailable. Lastly, and perhaps most importantly, SHGH had reason to believe that it would receive a lower interest rate on the bond if it retained most of its FDA. Nevertheless, while all of these factors weighed heavily in favor of retaining the available FDA, SHGH still did not want to give up the privilege of earning protected interest on its funded depreciation account.

In attempt to resolve its perceived dilemma, SHGH sought advice from its accountants, Coopers and Lybrand, on the following question: "To what extent must funded depreciation be committed to capital projects or replacement to avoid income offset?" Administrative Record ("A.R.") at 2695, 2922–2925. In an opinion letter to SHGH, dated March 16, 1982, Coopers and Lybrand replied that "[i]t is Medicare's position that borrowing when funded depreciation is already available creates a loan which results in excess funds." A.R. at 2923. Coopers and Lybrand analyzed the Hospital's proposed borrowing and reported:

> Based on the above regulations ... [the $500,000 and $1.5 million restrictions] would in all likelihood be considered *"firm commitments"* by Medicare since these are binding agreements with arm's length parties to the transaction. The other commitments, which are merely expressions of intent, would probably not be considered legitimate commitments by Medicare regardless of their likelihood of becoming a reality.

A.R. at 2924 (emphasis in original).

Apparently, SHGH was dissatisfied with its accountant's opinion and hired lawyers who determined that the Hospital could retain all of its FDA and still be reimbursed for the entire interest expense on any reasonable indebtedness. On April 15, 1982, SHGH borrowed the full amount needed to complete the project and retained all of its funded depreciation.

### C. *Administrative Background*

SHGH's intermediary determined that according to SHGH's 1984 cost report, all of the funded depreciation account should have been considered "available" and the Hospital should not have been reimbursed for any of the interest expense on the 1982 bond.

SHGH appealed the intermediary's adjustment to the PRRB, and an extensive hearing was held on the matter. According to the PRRB, the intermediary was partially in error since at the time of the 1982 borrowing, the Hospital did have some commitments against its funded depreciation account which met the requirements of PRM § 226, "as that section existed at the time of borrowing." *Hampton General Hospital*, PRRB Dec. No. 89–D15 (Jan. 9, 1989). Specifically, the PRRB determined that on April 15, 1982, SHGH had expressed an "intent to commit" $1.5 million of the FDA to the balloon payment on the 1975 bond issue, and had "earmarked" the $500,000 equity contribution. *Id.* The PRRB further concluded that SHGH had committed $727,703 to other capital expenditures before the borrowing, evidenced by documents to third parties. Thus, the PRRB decided that only $752,872 of the $14,675,000 was unnecessary borrowing and ordered the intermediary to make the appropriate adjustments.

The HCFA Administrator essentially reversed the PRRB's decision. The Administrator explicitly analyzed the Hospital's FDA to see whether the Hospital had contractual commitments against the funds which rendered the borrowing "necessary." The Administrator rejected the PRRB's conclusion that the $1.5 million balloon payment was sufficiently committed since the board had only expressed an "an intent to commit" the funds, an intention which was discussed "among other possible uses of the funds." *Hampton General Hospital*, HCFA Administrator Dec. (March 9, 1989). The Administrator also rejected the Hospital's claim that $727,713 for other capital expenditures was unavailable, and characterized that claim as an attempt "to assign available bills to the account without any

evidence of prior contractual commitment." *Id.* In sum, the Administrator found that SHGH had established a contractual commitment only with respect to the $500,000 contingency for the 1982 capital improvement project, and that the interest expense incurred on the $2,980,575 of unnecessary borrowing should have been disallowed.

## ANALYSIS

### A. *Standard of Review*

■■ Judicial review of the Secretary's final decisions on provider reimbursement under the Medicare Act is limited by 42 U.S.C. § 1395oo(f)(1), which requires the Court to apply the standards of the APA, 5 U.S.C. §§ 701 *et seq.* Under the APA, a reviewing court may set aside an administrative decision only if the decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A) and (E). SHGH vigorously challenges the decision of the Secretary on almost all of these grounds. It is well settled, however, that the Secretary's decisions interpreting the Medicare Act are entitled to "great deference." *Humana, Inc. v. Heckler,* 758 F.2d 696, 699 (D.C.Cir. 1985). And under the arbitrary and capricious standard, the scope of review is "narrow;" a reviewing court "is not to substitute its judgment for that of an agency." *Motor Vehicle Mfrs. v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Thus, even if we were to agree with appellant that other policies might better further the Secretary's stated objectives, we are compelled to accept the policies and rules adopted by the Secretary so long as they have a rational basis, are reasonably interpreted, and are consistent with the underlying statute. *Villa View Community Hospital, Inc. v. Heckler,* 728 F.2d 539, 543 (D.C.Cir.1984).

### B. *Arbitrary and Capricious Review*

■ SHGH principally argues that it is arbitrary and capricious for the Secretary to determine that a provider only has a "financial need" to borrow under § 413.-153(b)(2) of the regulations if the funds in a provider's FDA are "contractually committed." According to SHGH, the contractually committed standard articulated in PRM § 226 is irrational because it requires providers "to deplete all of their funded depreciation to replace assets representing an insignificant amount of [their] accumulated depreciation." Appellant's Brief at 19. SHGH believes that it would have been an exercise of poor financial judgment to commit all of its FDA in 1982 to the ICU/CCU project, since the accumulated depreciation attributable to the assets being replaced represented little more than five percent of the Hospital's total accumulated depreciation. In SHGH's view, the Secretary's regulations suggest that there must be some "nexus" between the funded depreciation utilized and the replacement of the assets which generated the funded depreciation. *Id.* Under the guidelines, SHGH notes, a provider's FDA may not exceed its total accumulated depreciation, and deposits to a FDA are generally made in an amount equal to the depreciation expense reimbursed each year. PRM § 226.3. Thus, SHGH concludes, the guidelines themselves require some "nexus" between the asset generating the funded depreciation, and the use of FDA to replace particular assets.

As the district court noted, "whatever its appeal as a general business proposition ... plaintiff's FDA allocation theory is untenable for lack of statutory or regulatory support." *Sentara Hampton General Hospital v. Louis W. Sullivan,* 799 F.Supp. 128 (D.D.C.1991). In fact, the 1968 provision made clear that providers were free to use their FDA, or any part of their FDA, for the "replacement of assets *or other capital purposes.*" PRM § 226. And while deposits to FDAs are often equal to the reimbursed depreciation expense, providers are free to deposit "cash or other liquid assets" into FDAs and use the accumulated funds for any capital expense. *Id.* Moreover, the guidelines do not *require* a provider to deplete its FDA if the provider believes retention would be prudent. PRM § 226 simply outlines the criteria for determining whether a provider

is entitled to the special benefit of having its interest expense reimbursed while also earning protected interest on its FDA.

■ SHGH next argues that the Secretary's interpretation of PRM § 226C is inconsistent with Medicare regulations which allow providers more flexibility in their financial planning. In particular, SHGH contends that the term "financial need" in 42 C.F.R. § 413.153(b)(2)(i) implies that the views of the "financial community" are highly relevant in any determination of what constitutes "necessary" borrowing. While we agree with SHGH that the views of financial experts are relevant, we do not believe that the use of the word "financial" in the term "financial need" evidences an intention by the Secretary to transfer his interpretive power to the "financial community." It is well established that courts "may not set aside the agency's interpretation merely because another interpretation was possible and seems better, so long as the agency's interpretation is within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute of D.C. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981). Here, the Secretary's interpretation of what constitutes "financial need" falls easily within the "range of reasonable meanings" of the term. *Id.* The Secretary has logically determined that if there are funds in a provider's FDA that are not contractually committed to a capital project, the provider does not have a financial "need" to borrow regardless of whether borrowing makes good financial sense. Thus, even if SHGH is correct that another definition of "financial need" might better further the Secretary's stated objectives, we agree with the district court's conclusion that PRM § 226, as revised, is in accordance with the Medicare statute and regulations, and is neither arbitrary nor capricious.

We are also unpersuaded by SHGH's argument that the Secretary's interpretation of "necessary and proper interest," defined in 42 C.F.R. 413.153, should be identical to the Secretary's interpretation of "necessary and proper costs," defined in 42 C.F.R. 413.9. Section 413.9 governs gener-

al operating costs, while § 413.153 specifically defines what is considered "necessary" interest expense. Although the Secretary's interpretation of "necessary" interest expense is more narrow than his interpretation of "necessary" general operating costs, the difference merely reflects the particular policy concerns that are relevant to the former and not the latter.

## C. *Notice and Comment*

■ SHGH also challenges the legitimacy of PRM § 226 on the grounds that the "contractually committed" standard is an invalid legislative rule improperly promulgated without APA notice and comment. 5 U.S.C. § 553. In SHGH's view, before 1983, the Secretary applied a "prudence" standard to cases involving the reimbursement of interest expense, and thus, the revisions of PRM § 226 reflect a dramatic change in agency policy. SHGH points to two cases affirmed by the HCFA Administrator, *Mercy Hospital*, Medicare and Medicaid Guide (CCH) ¶ 30,318 (HCFA Nov. 5, 1979), and *Research Medical Center*, Medicare and Medicaid Guide (CCH) ¶ 29,447 (Sept. 28, 1978), in support of its general conclusion that prior to the revisions of PRM § 226, providers were allowed to retain their FDA if the decision to do so amounted to "prudent" financial planning. SHGH also argues, in the alternative, that even if there was no "prudence" standard, SHGH still suffered from the "retroactive" application of substantive law because the contractually committed standard constitutes a mandatory, inflexible, and binding agency rule. The district court rejected these arguments, and so do we.

We turn first to SHGH's claim that the Secretary had established through adjudication a standard deeming borrowing "necessary" when "prudent." We note at the outset, however, that if such a standard did exist, it must have been an obscure one since SHGH's own accountants were unable to identify it. After a review of the relevant precedents and regulations, SHGH's accountants concluded without equivocation that most of the Hospital's funded depreciation would be considered available by Medicare. According to their

research, the Hospital's FDA was available because there were no "firm commitments" for the funds; "firm commitments," the accountants explained, are "binding agreements with arm's length parties to the transaction." *Deft.Mtn.*, Ex. E, p. 3. While it may have been mere coincidence that SHGH's accountants described a brand new rule that the Secretary would issue in the not too distant future, the interpretive history of PRM § 226 suggests that SHGH's accountants simply identified an existing standard that the Secretary later reaffirmed.

As early as 1976, the PRRB interpreted PRM § 226 as requiring the use of FDA before borrowing would be considered necessary. *See* PRRB Hearing Dec. No. 76–D11, Medicare and Medicaid Guide (CCH) ¶ 29,972 (March 30, 1976). That decision was affirmed by the Commissioner of Social Security and by the United States District Court for the Northern District of Illinois. *Northwest Hospital, Inc. v. Hospital Service Corp.*, 500 F.Supp. 1294 (N.D.Ill.1980), *aff'd* 687 F.2d 985 (7th Cir. 1982). The district court noted that "[o]f course [the provider] could exercise business judgment by obtaining a loan instead [of using its available FDA], but it cannot fairly impose the cost of that discretionary choice on the Medicare program." *Id.* at 1300. Similarly, in another 1976 decision, the PRRB disallowed interest expense incurred on capital borrowing, noting that "where a provider voluntarily funds depreciation, as opposed to being required to do so by virtue of agreements with creditors, these funds are available for all capital outlays." PRRB Hearing Dec. No. 76–D16, Medicare and Medicaid Guide (CCH) ¶ 27,843 (April 30, 1976).

However, as SHGH points out, less than a year after these decisions the PRRB tried to expand its view of what constitutes "necessary" borrowing. In December 1976, the PRRB held that certain external borrowings were reasonable and necessary even though the provider had unrestricted FDA funds. PRRB Hearing Dec. No. 76–D79, Medicare and Medicaid Guide (CCH) ¶ 28,337 (Dec. 30, 1976). It is important to note, though, that the Commissioner of So-

cial Security reversed the PRRB's decision, finding that the loan at issue "did not meet the basic criteria of the Regulations." *Henrietta D. Goodall Hospital*, Medicare and Medicaid Guide (CCH) ¶ 28,355 (Feb. 28, 1977). The Commissioner explained that

> [t]he Provider did not have a financial *need* to make the loan. *The borrowings could well have been dictated by a prudent business decision. . . . It is, however, illogical to say that a loan is "necessary" when there are ample unrestricted funds on hand.* . . . The Medicare program does not prevent a provider from self-restricting its funded depreciation for any particular purposes, but it will deny reimbursement to the provider for interest expenses incurred on external borrowing where adequate funded depreciation is available.

*Id.* (first emphasis in original, second emphasis added).

The Commission's decision was vacated by agreement of the parties in settlement negotiations. Although the vacation robs the Commissioner's decision of precedential value, it does not follow, as SHGH argues, that the PRRB's decision established a "prudence" standard. Quite to the contrary, in 1977, the Blue Cross Association, in an effort to guide intermediaries in their examination of a provider's capital borrowing and funded depreciation, issued Administrative Bulletin ("A.B.") 1186 which stated:

> [I]n assessing the availability of the provider's funds to determine whether borrowing is necessary, *any provider restricted funds would be considered available funds.* This would hold true even if the provider has a specific project for which the funds are segregated. If the provider decides to borrow even though provider restricted funds are available, the interest expense on the unnecessary funds would be disallowed. . . .

Yet, despite the pronouncements contained in A.B. 1186, and the clear statement of agency opinion expressed in *Henrietta D. Goodall Hospital*, the PRRB in July 1978 and again in September 1979, allowed

interest expense on borrowings where funded depreciation was available. In those two cases, *Research Medical Center* and *Mercy Hospital,* the Board determined that the loans were "necessary" partly because the "provider acted prudently." *See Research Medical Center,* PRRB Hearing Dec. No. 78–D57, Medicare and Medicaid Guide (CCH) ¶ 29,230 (July 28, 1978); *Mercy Hospital,* PRRB Hearing Dec. No. 79–D56, Medicare and Medicaid Guide (CCH) ¶ 30,130 (Sept. 6, 1979). In PRRB's view, interest expense on borrowing should be reimbursed where the funds are intended for a definite capital project, and the benefits of the provider's decision to borrow accrue to the Medicare program as well as the provider. *Id.*

SHGH argues that the affirmance of *Research Medical Center* and *Mercy Hospital* by the HCFA Administrator demonstrates that the Secretary adopted a policy of finding borrowing "necessary" where it was financially "prudent." *See Research Medical Center,* Medicare and Medicaid Guide (CCH) ¶ 29,447 (HCFA Sept. 28, 1979), and *Mercy Hospital,* Medicare and Medicaid Guide (CCH) ¶ 30,130 (HCFA Nov. 5, 1979). While these two HCFA decisions certainly reflect a more lenient interpretation of the regulations and the guidelines than the interpretation at issue here, they do not, in our view, establish a "prudence" standard. Aside from these two decisions, the HCFA has consistently construed PRM § 226 narrowly and reversed the PRRB when it accepted vague or intangible representations of commitment for FDA funds.

For instance, in *Bemidji Community Hospital,* Medicare and Medicaid Guide (CCH) ¶ 29,704 (HCFA May 4, 1979), a case which followed *Research Medical Center,* the Administrator attempted to reassert the HCFA's position on interest expense reimbursement. There, the Administrator specifically held that the provider's borrowing was unnecessary because its FDA was not "firmly committed" to other capital projects:

> The loan failed to meet the basic criteria of the regulations. *Borrowing could well have been a prudent decision....*

*but it is illogical to say that a loan was "necessary" when there was ample funded depreciation available....* [The] evidence presented showed that no firm commitments had been made through the cost years at issue, no liabilities incurred, or no funds committed to third parties toward the construction of this proposed new facility.... Under the circumstances it is unreasonable to conclude that funded depreciation which existed in 1974 and 1975 was committed to the construction of the hospital. *Id.*

And again, in 1981, the HCFA found borrowing unnecessary when it reversed the PRRB's decision in *St. Francis Community Hospital,* Medicare and Medicaid Guide (CCH) ¶ 31,673 (Nov. 20, 1981). The Administrator analyzed whether the provider was required to retain FDA funds "as part of its 1974 loan agreement" with a third party and found that the third party restriction was not sufficient to make the borrowing necessary. This case was the HCFA's last decision on interest allowability before SHGH's borrowing; however, the decision was later reversed by an unpublished opinion of a district court. *See St. Francis Community Hospital v. Schweiker,* 725 F.2d 677 (D.S.C.1983).

In sum, we agree with the district court that far from promulgating a "prudence" standard through adjudication, the HCFA consistently required a more "firm commitment" for FDA funds, while the PRRB repeatedly attempted to draw the boundaries more generously. Of course, had HCFA declined to review the PRRB findings concerning the determination of unnecessary borrowing, perhaps it could be said that the agency announced a new rule. But since the HCFA frequently overruled the PRRB's findings, the inconsistency between the PRRB and the HCFA "detracts substantially from the deference normally due an agency's interpretation of its own regulations." *Northwest Hospital,* 687 F.2d at 991. Thus, we conclude that HCFA did not promulgate a "prudence" standard by adjudication, the revocation of which would have required APA notice and com-

ment. *See* 5 U.S.C. § 551(5); *Motor Vehicle Mfrs.*, 463 U.S. at 42, 103 S.Ct. at 2866.

SHGH argues, in the alternative, that the revisions to PRM § 226 constitute a mandatory, inflexible, legislative rule requiring APA notice and comment, even if there was no "prudence" standard before 1983. The Secretary responds, that although the "contractually committed" standard may constitute a "rule" as that term is defined by § 551(4) of the APA, the revisions to PRM § 226 fall within the "interpretative rule" exception to the notice and comment requirement. 5 U.S.C. § 553(b)(A).

 As we noted in *American Hospital Ass'n v. Bowen*, the limited exceptions to the notice and comment requirement were created by Congress to "accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987), quoting *Guardian Federal Savings & Loan v. Federal Saving and Loan Insurance Corp.*, 589 F.2d 658, 662 (D.C.Cir.1978). In particular, the "interpretative rule" exception was designed to provide agencies with a degree of flexibility where "substantive rights are not at stake," and to allow administrative officers the freedom to explain what they think a regulation or statute means without undertaking cumbersome proceedings. *Bowen*, 834 F.2d at 1045; *see also Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir.1984). Like all exceptions to the notice and comment requirement, the interpretative rule exception is to be narrowly construed and only "reluctantly countenanced." *See Alcaraz*, 746 F.2d at 612.

 When an agency issues an interpretative rule, it is only intending to explain ambiguous language, or remind parties of existing duties—not create new law. *See Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 & n. 153 (D.C.Cir.1979); *Bowen*, 834 F.2d at 1045. An agency may not, under the interpretative rule exception, "constructively rewrite

[a] regulation" or "effect a totally different result." *National Family Planning and Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236 (D.C.Cir.1992).

 Nevertheless, interpretative rules may affect the way parties act or "alter the manner in which parties present themselves or their viewpoints to the agency." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C.Cir.1980); *Cabais v. Egger*, 690 F.2d 234, 238 (D.C.Cir.1982). Such effects are entirely permissible under the interpretative rule exception, so long as the rule represents the agency's explanation of a statutory or regulatory provision, and the rule is not intended to substantively change existing rights and duties. *Fertilizer Institute v. E.P.A.*, 935 F.2d 1303, 1308 (D.C.Cir.1991); *General Motors v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985).

We think it is relatively clear that the duties of intermediaries and providers have not markedly changed since 1968, or 1983, and that it was not the Secretary's intention to substantively change the roles of those parties. Before and after the 1983 revisions, providers were required to expend or commit their FDA before borrowing in order for their interest expense to be allowed. Similarly, intermediaries have always disallowed interest expense incurred on loans that were not "necessary" due to retained, uncommitted FDA. While it is probably true that the 1983 revisions made it easier for the Secretary to enforce the regulations, we made clear in *American Hospital Ass'n v. Bowen*, that stricter enforcement of the same standard must be distinguished from the enforcement of new obligations. *Bowen*, 834 F.2d at 1051.

In our view, the revisions to PRM § 226 merely restate the HCFA position on the allowability of interest expense, and serve to clarify what constitutes "available" FDA and "necessary" borrowing. Since the clarification of ambiguous terms such as these is precisely the type of agency action that the "interpretative rule" exception was designed to accommodate, we affirm the district court's conclusion that SHGH

did not suffer from the "retroactive" application of substantive law. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

### D. *Substantial Evidence Determination*

SHGH's final argument is that the Administrator's decision is contrary to the evidence in the record. SHGH agrees with the district court's conclusion that the Administrator erred in excluding the Hospital's purchase orders executed before the date of borrowing, but argues that the district court should have also found that the Hospital was contractually committed to the $1.5 million balloon payment which was due in 1985. We agree with the district court that substantial evidence supports the Administrator's determination that the Hospital did not meet the standard articulated in PRM § 226 for the balloon payment. There was no evidence that a separate account was created to restrict the funds (as was the case with the $500,-000 contingency payment for the ICU/CCU project), and there was no agreement with SHGH's lenders to set aside or restrict the cash to ensure payment. In the absence of any commitment, evidenced by a contract executed before the date of borrowing, to use the FDA funds for the balloon payment, we hold that the district court was correct in concluding that the Administrator's decision was supported by substantial evidence.

In addition, although we affirm the district court's general conclusion that SHGH's purchase orders, executed before the date of borrowing, satisfy the requirements of PRM § 226, we have decided to grant the government's cross-appeal which slightly reduces the district court's determination of necessary borrowing. The Secretary does not challenge the district court's modification of the Administrator's decision except to the extent that it includes one particular purchase order, in the amount of $119,025, which was executed after the date of borrowing. Since the inclusion of this purchase order appears to be no more than a minor mistake by the district court, and SHGH does not dispute the accuracy of the government's claim, we grant the government's cross-appeal and reduce the district court's determination of necessary borrowing accordingly.

In a last ditch effort to save its claim, SHGH contends that the HCFA's decision is completely unsupported by substantial evidence because the Administrator failed to apply the "spenddown" principle to this case. SHGH argues that if a provider with a positive FDA balance at the time it decides to borrow, spends the balance on other capital projects before the end of the cost reporting year, the proper application of the first-in, first-out accounting principle "cures" the provider's unnecessary borrowing. As the district court properly noted, the regulations do not require the Administrator to apply this principle, and the guidelines make clear that providers are required to make the "availability" decision without reference to future plans, unless those plans are part of an executed contract. PRM § 226. Thus, in accordance with the clear language of PRM § 226, we view any funds not contractually committed to an ongoing project on the day of borrowing to be "available," and affirm the district court's and Administrator's decision to deny SHGH's request to apply the "spenddown" principle.

### CONCLUSION

We affirm the district court's conclusion that the "contractually committed" standard articulated in PRM § 226 is in accordance with the law, and not arbitrary or capricious. We also agree that PRM § 226 is an interpretive rule, not requiring notice and comment under the APA. Thus, the only modification we make to the district court's decision is to reduce its determination of SHGH's "necessary" borrowing by $119,025, the amount of the purchase order which was executed after the date of borrowing.

*It is so ordered.*