23 F.3d 412
 306 U.S.App.D.C. 104, 62 USLW 2711,
44 Soc.Sec.Rep.Ser. 391,
Medicare & Medicaid Guide P 42,264
 HEALTH INSURANCE ASSOCIATION OF AMERICA, INC., Appellant,
v.
Donna E. SHALALA, Secretary, Health and Human Services, et
al., Appellees.
BLUE CROSS AND BLUE SHIELD ASSOCIATION, Appellant,
v.
Donna E. SHALALA, Secretary, Health and Human Services, et
al., Appellees.
 Nos. 92-5196, 92-5197.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 29, 1993.
Decided May 13, 1994.
 
 Appeal from the United States District Court for the District of Columbia (90cv01356).
 Walter A. Smith, Jr., argued the cause, for appellant Health Ins. Ass'n of America, Inc. in No. 92-5196. With him on the joint briefs were William P. Flanagan, Robert J. Cynkar and Janice H. Ziegler. R. Kenly Webster entered an appearance.
 Robert J. Cynkar argued the cause, for appellant Blue Cross and Blue Shield Ass'n, Inc. in No. 92-5197. With him on the joint briefs were Janice H. Ziegler, Walter A. Smith, Jr. and William P. Flanagan.
 John F. Daly, Atty., U.S. Dept. of Justice, argued the cause, for appellees. With him on the brief were J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, Anthony J. Steinmeyer and Michael Raab, Attys., U.S. Dept. of Justice, and Robert L. Roth, Atty., U.S. Dept. of Health and Human Services.
 On the brief for amicus curiae Self-Insurance Institute of America, Inc. was George J. Pantos.
 On the brief for amici curiae Group Health Ass'n of America and American Managed Care and Review Ass'n was William G. Kopit.
 Before: MIKVA, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 Concurring opinion filed by Circuit Judge HENDERSON.
 Opinion concurring in part and dissenting in part by Chief Judge MIKVA.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 The appellants in these two consolidated cases raise facial challenges to five Medicare regulations promulgated by the Health Care Financing Administration ("HCFA") on behalf of the Secretary of Health and Human Services. They also contend that even if the regulations are valid, the Secretary is attempting to give improper retroactive effect to four of them. In a comprehensive opinion, the district court upheld all five regulations and rejected the appellants' retroactivity arguments. Blue Cross & Blue Shield Ass'n v. Sullivan, 794 F.Supp. 1166 (D.D.C.1992). We affirm in part. We conclude that two of the five regulations go beyond the Secretary's statutory authority and hence are invalid. We also disagree with the district court's retroactivity analysis.
 
 I. The Statutory Framework
 
 2
 Medicare is a system of federally funded health insurance for the aged, the disabled, and people suffering from end-stage renal disease. Many people covered by Medicare are also eligible for benefits under group health plans provided by employers. For its first fifteen years, Medicare paid for services without regard to whether they were also covered by an employer group health plan. As a cost-cutting measure, however, Congress eventually enacted a series of amendments designed to make Medicare a "secondary" payer with respect to such plans. These amendments have been codified at 42 U.S.C. Sec. 1395y(b), which is referred to as the "Medicare as Secondary Payer" ("MSP") statute.
 
 
 3
 The structure of the MSP statute is relatively simple. Paragraph (1) imposes certain requirements on employer group health plans.[1] A nondiscrimination provision, for instance, insists that plans other than those provided by small employers must provide the same benefits under the same conditions to aged employees (and to aged spouses of employees) as to other employees and spouses. 42 U.S.C. Sec. 1395y(b)(1)(A)(i)(II) (Supp. IV 1992). In addition, when someone age 65 or older is covered by an employer group health plan by reason of his current employment (or the current employment of his spouse), the plan "may not take into account" that his age entitles him to Medicare benefits. Id. Sec. 1395y(b)(1)(A)(i)(I). The effect of this is to nullify any plan provision that would "carve out" expenses covered by Medicare and thus, in effect, make the plan's coverage secondary to Medicare's.[2] Somewhat similar provisions deal with people suffering from end-stage renal disease. See id. Sec. 1395y(b)(1)(C). With exceptions not relevant here, large group health plans also "may not take into account" that an employee or a member of his family is entitled to Medicare benefits by reason of disability. Id. Sec. 1395y(b)(1)(B).
 
 
 4
 Paragraph (2) then makes Medicare the "secondary" payer with respect to coverage required under paragraph (1), and spells out the means by which that purpose is to be realized. Subparagraph (A) prohibits Medicare from making any payment, other than a conditional one, for any item or service to the extent that "payment has been made [under a group plan], or can reasonably be expected to be made [under a group plan], with respect to the item or service as required under paragraph (1)". Id. Sec. 1395y(b)(2)(A)(i). Subparagraph (B) then explains what it means for a payment to be conditional; in a clause headed "Primary Plans",[3] it declares that any Medicare payment under the circumstances described in subparagraph (A) "shall be conditioned on reimbursement to the appropriate Trust Fund ... when notice or other information is received that payment for such item or service has been or could be made under such subparagraph." Id. Sec. 1395y(b)(2)(B)(i). In order to recover conditional payments, the next clause continues, "the United States may bring an action against any entity which is required or responsible under this subsection to pay with respect to such item or service (or any portion thereof) under a primary plan...." Id. Sec. 1395y(b)(2)(B)(ii). Indeed, when an employer group health plan "fails to provide for primary payment (or appropriate reimbursement) in accordance with ... paragraphs (1) and (2)(A)", a private party or the federal government can sue for double damages. Id. Sec. 1395y(b)(3)(A). In addition, the federal government is subrogated (to the extent of any payment for an item or service to which subparagraph (2)(A) applies) "to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan." Id. Sec. 1395y(b)(2)(B)(iii).
 
 II. The Challenged Regulations
 
 5
 Acting as the Secretary's delegate, HCFA has promulgated regulations to carry out the MSP statute. The appellants, the Health Insurance Association of America and the Blue Cross and Blue Shield Association, both challenge three regulations as going beyond the Secretary's statutory authority, and each challenges one that the other does not attack. All parties agree that we are to uphold each regulation unless it contradicts "the unambiguously expressed intent of Congress" or is not a "reasonable interpretation" of an ambiguous statutory provision. Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 
 6
 A. 42 CFR Sec. 411.24(e)--third-party administrator liability.
 
 
 7
 Both appellants are associations of health-insurance companies whose members often enter into contracts with employers or employer group health plans. Under some of these contracts, the companies underwrite some or all of the health plan's benefits. Frequently, however, employers self-insure, and hire one of the appellants' member companies merely to perform administrative services such as adjudicating claims and writing benefit checks drawn on accounts stocked with the employer's money. "[A]lthough there are variations in these [administrative-services] contracts," explains amicus curiae the Self-Insurance Institute of America ("SIIA"), "administrators customarily do not pay the financial obligations of their plan customers from their own funds or commingle plan funds with their own funds." Brief of Amicus Curiae SIIA 12 (emphasis in original); cf. Joint Appendix ("J.A.") 290-98 (sample administrative-services contract).
 
 
 8
 Nonetheless, HCFA believes that these third-party administrators are "required or responsible under [the MSP statute] to pay ... under a primary plan" within the meaning of 42 U.S.C. Sec. 1395y(b)(2)(B)(ii), and hence that they are subject to suit by HCFA for recovery of conditional payments. Though HCFA's regulations did not explicitly take this position until 1989, 42 CFR Sec. 411.24(e) now asserts that "HCFA has a direct right of action to recover from any entity responsible for making primary payment. This includes an employer, an insurance carrier, plan, or program, and a third party administrator." (Emphasis added).
 
 
 9
 The appellants argue that this regulation contradicts the plain language of the MSP statute, or at any rate represents an impermissible resolution of ambiguities in that statute. They insist that when an insurance company contracts with an employer or an employer group health plan merely to administer the plan, without putting the company's own funds at risk by assuming ultimate financial liability for making payments under it, HCFA cannot seek recovery from the company for conditional payments, but instead can sue only the employer or the plan itself. Three district courts have agreed. See United States v. Travelers Ins. Co., 815 F.Supp. 521, 524 (D.Conn.1992); Provident Life & Accident Ins. Co. v. United States, 740 F.Supp. 492, 503-04, amended, 1990 U.S.Dist. LEXIS 12810 (E.D.Tenn.1990); United States v. Blue Cross & Blue Shield of Michigan, 726 F.Supp. 1517, 1521-22 (E.D.Mich.1989).
 
 
 10
 The essence of the appellants' argument is that HCFA is wrong to equate the statutory phrase "responsible ... to pay" with the phrase "responsible for making ... payment". According to Amicus SIIA, "Any common sense reading of the phrase 'responsible to pay' could only mean the party that bears the ultimate financial risk." Brief of Amicus Curiae SIIA at 7 n. 10.
 
 
 11
 This argument is somewhat weakened by the fact that the statute does not use the word "responsible" alone, but also explicitly encompasses entities "required" to pay insurance benefits. As a matter of pure language, this phrase can be read to focus not on which entities bear the financial risk under a plan, but rather on which entities must fulfill the requirements imposed by a plan. These requirements of course include not only what the employer and employees may have agreed on, but also the substantive enlargements mandated by the MSP statute itself via its nondiscrimination provisions and its bans on "tak[ing] into account" Medicare coverage. Even an entity that merely administers a plan, then, is literally "required" by the MSP statute, coupled with the plan itself and the contract to render administrative services, to pay for services rendered to Medicare beneficiaries under the plan.
 
 
 12
 There remains, however, the question whether it is "reasonable" to interpret paragraph (2)(B)(ii) to subject such entities to suit. See Chevron, 467 U.S. at 843, 845, 104 S.Ct. at 2782, 2783. "As a practical matter, resolution of an ambiguity in a statute, if it has consequences, inevitably requires the agency to consider competing policy objectives", and "it is the reconciliation of such conflicts that is entitled to judicial deference". Wagner Seed Co. v. Bush, 946 F.2d 918, 923 (D.C.Cir.1991). In some sense, then, review of an agency's construction of an ambiguous statute is review of the agency's policy judgments. While we are to defer to those judgments, we cannot accept them if they seem wholly unsupported or if they conflict with the policy judgments that undergird the statutory scheme. Thus the Chevron Court upheld the interpretation at issue there only after concluding that it "is a reasonable policy choice for the agency to make". Chevron, 467 U.S. at 845, 104 S.Ct. at 2783.
 
 
 13
 We start the consideration of HCFA's policy claims by considering the potential reach of its linguistic argument for reading the MSP statute to authorize recovery actions against administrators that assume no financial responsibility for paying a plan's benefits. The bank on which a plan's benefit checks are drawn is literally both "required" and "responsible" to pay group insurance benefits when presented with such a check. Cf. U.C.C. Sec. 4-402 (describing banks' liability for wrongful dishonor of checks); id. Sec. 4-404 (saying that banks have "no obligation ... to pay a check, other than a certified check, which is presented more than six months after its date"). In the context of the MSP scheme, however, it would be wholly unreasonable for HCFA to treat the bank as a responsible payer subject to recovery actions. Third-party administrators obviously present a closer case, but, given HCFA's sketchy theories, perhaps not all that much closer.
 
 
 14
 Since insurance companies often serve as third-party administrators, the government complains that "Medicare will often not even know, initially, whether the insurer is acting as a [third-party administrator] or as a conventional insurer in a given instance". Appellees' Brief at 31-32. The appellants respond that HCFA need only ask the third-party administrator to direct it to the responsible payer. Appellants' Reply Brief at 12 n. 11. The government suggests that this might be impracticable, because the distinction between insurers and third-party administrators is often "murky" in light of the "highly complex and enormously varied" contracts between outside companies and employer group health plans. Appellees' Brief at 32. For example, insurance companies and employer group health plans sometimes agree that the plan will fund its own benefits up to a specified maximum total each year, and that the insurance company--in addition to providing administrative services--will underwrite benefits once that ceiling is reached. See J.A. 222, 299-301. Under such contracts, it might not be entirely clear whether the employer or the insurance company bears ultimate financial liability for any given item or service. But the existence of contracts under which the financial liability is "murky" seems an odd justification for imposing it on a party who--by perfectly clear contract--is plainly not liable.
 
 
 15
 The government also suggests that unless third-party administrators face the threat of recovery actions, they will deny the claims of Medicare-eligible employees, knowing that Medicare then will pay primary. According to the government, it is appropriate for HCFA to seek recovery from third-party administrators directly because they "are the entities that actually make claims determinations" and are "generally better positioned than self-insured employers to assure the plan's compliance with MSP requirements." Appellees' Brief at 32.
 
 
 16
 This argument seems a complete jumble. First, the government gives no clue what the third-party administrator would have to gain from exposing its client to liability under the MSP statute--including double damages under Sec. 1395y(b)(3). Second, expertise in traversing the technical underbrush of Medicare and other medical insurance requirements can hardly be the touchstone of liability; under such a view the third-party administrator's law firm might be the best candidate. Finally, HCFA offers no evidence to support its scenario of deliberate evasion by administrators.
 
 
 17
 Unless HCFA can come up with stronger reasons to support subjecting third-party administrators to recovery actions, we do not think they can reasonably be considered "required or responsible under [the MSP statute] to pay ... under a primary plan" within the meaning of 42 U.S.C. Sec. 1395y(b)(2)(B)(ii). We agree with HCFA that if such actions were necessary to accomplish Congress's goals, HCFA's construction of the statute would be reasonable. But the record before us does not come close to showing that HCFA will be hamstrung or even perceptibly inconvenienced unless it can proceed directly against administrators.
 
 
 18
 B. 42 CFR Sec. 411.24(i)--"double payment".
 
 
 19
 The appellants also challenge 42 CFR Sec. 411.24(i), which they have dubbed "the double-payment regulation". Section 411.24(i)(2) applies when a third-party payer which "is, or should be, aware" that Medicare has already made a conditional primary payment for a covered item or service nonetheless pays an entity other than Medicare--usually the beneficiary, a provider, or a supplier--for that item or service. If the recipient of the third-party payment fails to reimburse Medicare within sixty days, as required under 42 CFR Sec. 411.24(h), then "the third party payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party". 42 CFR Sec. 411.24(i)(1).
 
 
 20
 According to the appellants, "nothing in the statute ... requires an insurance company in such a situation to pay Medicare rather than the individual to whom the company is contractually liable, much less pay both." Appellants' Opening Brief at 17-18. Once the company has complied with its contractual duties to reimburse a beneficiary or provider, the appellants insist, it is no longer "responsible ... to pay ... under a primary plan" and hence cannot be sued under clause (2)(B)(ii) of the MSP statute. Id. at 15.
 
 
 21
 This conclusion draws some support from the structure of that clause. After providing for direct actions against any entity that is required or responsible to pay under a primary plan, the MSP statute goes on to authorize actions against "any other entity (including any physician or provider) that has received payment from that entity with respect to the item or service". 42 U.S.C. Sec. 1395y(b)(2)(B)(ii). In the absence of other indications, one might infer from these provisions that whenever a third-party payment has been made, the government's direct right of action lies only against its recipient. One district court, without much analysis, has accepted this conclusion. Provident, 740 F.Supp. at 504-05.
 
 
 22
 In asserting the invalidity of 42 CFR Sec. 411.24(i), however, both the Provident court and the appellants have ignored an important element of the MSP statute: the government's subrogation rights. Suppose that a 65-year-old employee's surgery is covered both by Medicare and his employer's group health plan, and that Medicare makes the payment initially. The fact that Medicare has made a payment obviously does not excuse the employer's health plan from paying; paragraph (1) of the MSP statute explicitly forbids the plan to "take account of" the patient's eligibility for Medicare, and thus requires the plan to make the payment that it otherwise would have made. Since "payment ... can reasonably be expected to be made ... as required under paragraph (1)," Medicare's payment is conditional. 42 U.S.C. Sec. 1395y(b)(2)(A)(i). And as soon as HCFA makes its conditional primary payment, it is "subrogated ... to any right under [the MSP statute] of an individual or any other entity to payment with respect to such item or service under a primary plan." Id. Sec. 1395y(b)(2)(B)(iii).
 
 
 23
 Although subrogation law varies from state to state, there are many common features. Suppose a tortfeasor injures a victim, and the victim's insurance company pays his loss and becomes subrogated to his rights against the tortfeasor. Suppose further that the tortfeasor knows of the insurance company's payment (and hence its subrogation rights), but nonetheless deals with the victim directly and obtains a general release from him in exchange for a cash settlement. The victim can no longer proceed against the tortfeasor, but the insurance company generally can--even though it is simply subrogated to the victim's rights. See, e.g., 6A John Alan Appleman & Jean Appleman, Insurance Law and Practice Sec. 4092, 246-49 & n. 16 (1972 & Supp.1992) (collecting cases); John F. Dobbyn, Insurance Law in a Nutshell 241-42 (2d ed. 1989); 3 Rowland H. Long, The Law of Liability Insurance Sec. 23.04, 23-42 (1993) (collecting cases); 16 Ronald A. Anderson, Couch on Insurance Sec. 61:201 (2d ed. 1983 & Supp.1993) (collecting cases). But see id. Sec. 61:202 (citing a few contrary cases). In other words, knowing payment by the obligor (tortfeasor) to the wrong party (tort plaintiff) does not bar recovery by the right party (insurer, the right party by virtue of subrogation). The analogy seems quite apt.
 
 
 24
 To be sure, 42 CFR Sec. 411.24(i) applies when the third-party payer "is, or should be, aware" of Medicare's primary payment at the time that it makes its own payment. But in the liability-insurance context, at least one standard treatise explicitly declares that the victim's release does not bar the subrogee's right of recovery from the tortfeasor as long as the tortfeasor obtained the release "with knowledge, actual or constructive, of the fact that the insurers have already paid to the insured the amount of their liability to him". Couch on Insurance Sec. 61:201 (emphasis added). Court decisions confirm that view. See, e.g., Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 107 (2d Cir.1992) (citing cases).
 
 
 25
 Given this background, the appellants simply are incorrect that 42 CFR Sec. 411.24(i) represents an improper attempt to extend the MSP statute's double-damage penalties, or to impose liability on entities that are no longer responsible to pay under a plan. If a third-party payer wants to avoid having to make two payments for the same service, it should refrain from paying someone whom it knows or should know that HCFA already has paid.[4]
 
 
 26
 We of course do not endorse every possible reading that HCFA may in the future give to the words "should be ... aware". According to HCFA's Paul J. Olenick, the agency finds this condition met only when the third-party payer "has in its possession direct information that Medicare has made a conditional primary payment or information necessary to draw the conclusion that Medicare has made a conditional primary payment". J.A. 418-20. The latter reference evidently means that HCFA expects third-party payers to draw certain inferences based on published Medicare procedures. For instance, if a third-party payer turns down a claim filed by an aged employee who is eligible for Medicare, Medicare will pay the beneficiary unless the claim was denied for one of four specified reasons. See 42 CFR Sec. 411.75. If the beneficiary later appeals the private payer's denial of his claim and gets it reversed, HCFA expects the private payer to infer that Medicare has made a conditional payment. J.A. 419. We do not have the details of any such transaction before us, and thus pass no judgment on how the regulatory language may work out in application. But we cannot find that the regulation violates the statute.
 
 
 27
 C. 42 CFR Sec. 411.24(f)--override of claims procedures.
 
 
 28
 The final regulation challenged by both appellants is 42 CFR Sec. 411.24(f), which asserts that Medicare can recover conditional payments "without regard to any claims filing requirements that the ... plan imposes on the beneficiary or other claimant." According to the regulation, then, if HCFA pays for a service that would also be covered under an employer group health plan if the plan's procedures (such as filing deadlines) were observed, HCFA can demand reimbursement from the plan even if those procedures were not followed.
 
 
 29
 In an affidavit filed with the district court, HCFA's Paul J. Olenick disclaimed any intent to seek recovery when the beneficiary violates "a contractual requirement that goes to the essence of the insurance obligation". According to Olenick, requirements for "pre-approval of certain treatments" fall within this class, for "HCFA recognizes the cost-savings implications of these programs and supports them". J.A. 413. The government now relies on this affidavit to conclude that the regulation authorizes HCFA to override only the "routine filing deadlines applicable to plan members", not other plan limitations. Appellees' Brief at 34-35.
 
 
 30
 As an interpretation of the regulation (rather than as a statement about how HCFA intends to enforce it), this position is absurd. The regulation explicitly mentions "a time limit for notifying the plan ... about the need for ... services" as an example of the procedural requirements that HCFA is free to override. 42 CFR Sec. 411.24(f)(1). But for purposes of argument we will suspend our disbelief and treat the government's current position as an authoritative interpretation of the regulation. Even so, we would find the regulation an invalid extension of the MSP statute.
 
 
 31
 If the regulation has any statutory basis, it springs from HCFA's independent right to recover conditional payments under the first two clauses of paragraph (2)(B) of the MSP statute, not from HCFA's subrogation rights under the third clause. After all, unless the plan has done something to cause the deadline to be missed, it certainly would have a good defense against the claimant who missed the deadline, and hence against any claim by HCFA as subrogee.[5]
 
 
 32
 The appellants contend that this conclusion ends the matter; they believe that the government's substantive recovery rights stem entirely from the subrogation provision of clause (2)(B)(iii) of the MSP statute. It seems clear, however, that in making certain payments conditional in clause (2)(B)(i) and then creating a direct government right of action to recover them in clause (2)(B)(ii), Congress intended something independent of the subrogation provided for in clause (2)(B)(iii). Indeed, this appears to be the case under a somewhat parallel statute the appellants themselves invoke, 42 U.S.C. Sec. 2651(a). See, e.g., Commercial Union Ins. Co. v. United States, 999 F.2d 581, 587 (D.C.Cir.1993) (government right to sue not limited by judgment or settlement obtained by tort victim); United States v. Theriaque, 674 F.Supp. 395 (D.Mass.1987) (government's independent right of action entitles it to full recovery even where tort victim's right would be limited by comparative negligence).
 
 
 33
 Nonetheless, the government's position is not consistent with the language of the particular statute that here creates the independent right of action. Clause (2)(B)(i) provides that any Medicare payment is "conditioned on reimbursement" if it is a "payment under this subchapter with respect to any item or service to which subparagraph (A) applies." Subparagraph (A) in turn embraces payments "with respect to any item or service to the extent that ... payment has been made, or can reasonably be expected to be made" under the plan. If the beneficiary and provider have already missed the filing deadline by the time Medicare makes its payment, then neither of those two criteria is satisfied, and the authorization of recovery actions in clause (2)(B)(ii) applies only to an "item or service" as to which (2)(B)(i) makes Medicare's payment "conditioned on reimbursement." Moreover, clause (2)(B)(ii)'s own language imposes independent obstacles to HCFA's view. Even if Medicare makes its payment before the plan's deadline passes, so that payment might be "expected to be made" under subparagraph (2)(A), the government's direct right of action lies against "any entity which is required or responsible under this subsection to pay ... under a primary plan," 42 U.S.C. Sec. 1395y(b)(2)(B)(ii) (emphasis added)--not against an entity that would have been responsible to pay if the beneficiary (or other obligee) had followed the proper procedures. Likewise, HCFA can seek reimbursement from the plan "when notice or other information is received that payment for such item or service ... could be made" under the plan, id. Sec. 1395y(b)(2)(B)(i) (emphasis added)--not (as the district court quoted the MSP statute to say) "when notice or other information is received that payment for such item ... could have been made" under the plan, see 794 F.Supp. at 1172 (emphasis added).[6]
 
 
 34
 D. 42 CFR Sec. 411.32(a)(1)--"carve out" and "Medigap" restriction.
 
 
 35
 Before the district court, Blue Cross/Blue Shield--but not the Health Insurance Association--also challenged 42 CFR Sec. 411.32(a)(1), which provides that "Medicare benefits are secondary to benefits payable by a third party payer even if State law or the third party payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries." The appellants concede that the MSP statute nullifies "carve-out" provisions in employer group health plans that purport to reduce or eliminate benefits as a result of coverage by Medicare. But the appellants protest that Sec. 411.32(a)(1), as interpreted by HCFA, treats "Medigap" policies--private insurance contracts that supplement Medicare by covering expenses not covered by the government, such as deductible or coinsurance amounts--like giant carve-outs, effectively transforming them into comprehensive policies.
 
 
 36
 The statutory analysis that the appellants offer in support of their protest strikes us as confused. Focusing entirely on paragraph (2) of 42 U.S.C. Sec. 1395y(b), the appellants contend that the MSP statute is triggered only when Medicare and an employer health plan provide overlapping coverage, and that this situation never arises with "Medigap" policies. Under this argument, however, the MSP statute would not override even what the appellants admit are impermissible carve-outs. The statutory authority for 42 CFR Sec. 411.32(a)(1) must start with paragraph (1) of 42 U.S.C. Sec. 1395y(b), for it is that paragraph that forbids plans to "take account of" certain individuals' eligibility for Medicare.
 
 
 37
 That said, we confess that the scope of any disagreement between HCFA and the appellants is far from clear to us. The MSP statute and 42 CFR Sec. 411.32(a)(1) deal only with employer group health plans, and so the working aged are free to purchase "Medigap" policies on their own.[7] What is more, the government conceded at oral argument that employer group health plans are free to provide "Medigap" coverage to retirees and their spouses. Conversely, the appellants concede that the nondiscrimination provisions of 42 U.S.C. Sec. 1395y(b)(1) preclude employers from offering their Medicare-eligible employees only "Medigap" coverage, while offering comprehensive coverage to their other employees. See Appellants' Reply Brief at 14 n. 13. Blue Cross/Blue Shield's complaint in the district court suggests that its principal concern may be that one of its member companies--in performing its contract with an employer group health plan--will mistakenly provide only "Medigap" coverage for an employee in the belief that he is retired, and will find itself liable for his health-care costs to the full extent of the plan's coverage of other employees. See J.A. 50. But while the appellants alluded to this fear at oral argument, they have not otherwise discussed it on appeal. The affidavit that they cite as revealing HCFA's interpretation of the regulation, moreover, does not give us a clearer sense of what is at stake. See J.A. 517.
 
 
 38
 We decline to speculate about the factual settings in which HCFA will invoke the regulation. On its face, 42 CFR Sec. 411.32(a)(1) does not appear inconsistent with the MSP statute; indeed, at oral argument the government took the view that the regulation merely restated the substantive requirements of 42 U.S.C. Sec. 1395y(b)(1). To the extent that the regulation restates the MSP statute, we of necessity affirm it; insofar as it may do anything else, we can detect no issue fit for judicial review. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). The appellants may, of course, litigate HCFA's attempts to apply the regulation on a case-by-case basis as warranted.
 
 
 39
 E. 42 CFR Sec. 411.25(a)--mandatory notice.
 
 
 40
 In the district court, the Health Insurance Association--but not Blue Cross/Blue Shield--attacked 42 CFR Sec. 411.25(a), which declares that "[i]f a third party payer learns that HCFA has made a Medicare primary payment for services for which the third party payer has made or should have made primary payment, it must give notice to that effect to the Medicare intermediary or carrier that paid the claim." In contrast to its position on the other four regulations, the government does not see Sec. 411.25(a) as a mere interpretation of the MSP statute; instead, it views the regulation as a legislative rule promulgated under the Secretary's authority to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs". 42 U.S.C. Sec. 1395hh(a)(1).
 
 
 41
 The appellants argue that Sec. 411.25(a) was promulgated in violation of the notice-and-comment procedures required of legislative rules by the Administrative Procedure Act. See 5 U.S.C. Sec. 553(b). It is true that Sec. 411.25(a) was added in response to comments that HCFA received on its proposed rule, and hence appeared for the first time in the final rule. Compare 53 Fed.Reg. 22335 (June 15, 1988) (proposed rule) with 54 Fed.Reg. 41716, 41718 (Oct. 11, 1989) (final rule). But the question for us is whether the final rule is a "logical outgrowth" of the proposals on which the public had the opportunity to comment. United Steelworkers of America v. Marshall, 647 F.2d 1189, 1221 (D.C.Cir.1980); Aeronautical Radio, Inc. v. FCC, 928 F.2d 428, 445-46 (D.C.Cir.1991); cf. International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973).
 
 
 42
 We think that this test is met here. In explaining the background to its proposed rules, HCFA specifically bemoaned the fact that, in its experience, "many 'Medicare secondary payer' (MSP) claims are not identified for MSP processing". 53 Fed.Reg. at 22335. Underneath a heading that proclaimed HCFA's intention "To Ensure Identification of Other Payers That Are Primary to Medicare", HCFA added:
 
 
 43
 Although the changes in the law have clarified HCFA's ability to recover conditional payments, it is obvious that there can be no recovery without identification of other insurers that are primary to Medicare. We believe that this aspect of the problem must be dealt with in regulations to the maximum extent permitted under current law.
 
 
 44
 Id. at 22337. Likewise, one of HCFA's proposed rules declared that if Medicare makes a conditional payment, "The filing of a Medicare claim by or on behalf of the beneficiary constitutes an express authorization for the third party to release to Medicare an[y] information pertinent to the Medicare claim." Id. at 22347. We believe that HCFA's initial notice adequately foreshadowed 42 CFR Sec. 411.25(a).
 
 
 45
 The appellants also attack the substance of Sec. 411.25(a), asserting that Congress did not intend to let the Secretary require "private monitoring". One might think that the regulation does not call for any such thing, for it is triggered only when a third-party payer "learns" that Medicare has made a primary payment. But according to the declaration of HCFA's Paul Olenick, HCFA interprets the word "learns" in this regulation to mean the same thing as the already discussed phrase "is, or should be, aware" in 42 CFR Sec. 411.24(i)(2), J.A. 419, and considers it to embrace a situation where a third-party payer "receives the information necessary to draw the conclusion that Medicare has made a conditional payment", id. at 420. Again, HCFA evidently expects third-party payers to draw some inferences based on Medicare's public procedures.
 
 
 46
 Although Mr. Olenick's statements suggest that HCFA intends to read "learn" broadly, we review only the regulation; just how far HCFA may stretch the language, under the usual judicial deference to an agency's interpretation of its own regulations, see, e.g., United States v. Larionoff, 431 U.S. 864, 872-73, 97 S.Ct. 2150, 2155-56, 53 L.Ed.2d 48 (1977), must await resolution in concrete cases. The regulation, however, seems to us not to go beyond the Secretary's statutory authority. For their claim that it does, the appellants appear mainly to rely on the principle of expressio unius est exclusio alterius, pointing to specific congressional requirements of notice. Thus, they note that the MSP statute requires the Commissioner of the Social Security Administration to request certain information from the IRS and to disclose information to HCFA that would help identify situations in which Medicare is a secondary payer; it also requires employers to respond to certain inquiries from Medicare intermediaries or carriers. See 42 U.S.C. Sec. 1395y(b)(5)(A) & (C). But the usual vulnerabilities of the expressio unius doctrine, especially in the context of mandates to administrative agencies, see, e.g., Cheney R.R. Co. v. ICC, 902 F.2d 66, 68-69 (D.C.Cir.1990), coupled with Congress's explicit delegation of rulemaking authority to the Secretary to aid in administering the Medicare program and the apparent reasonableness of the Secretary's requirement, all undermine the negative inference that the appellants invite us to draw.
 
 III. Retroactivity
 
 47
 The effective date of the regulations at issue here was November 13, 1989. But with the exception of the notice requirement of 42 CFR Sec. 411.25(a), the Secretary claims the ability to apply the regulations that we have upheld to transactions that occurred prior to that date. The appellants contend that such application would be invalidly retroactive. Each regulation, they say, "creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past", Association of Accredited Cosmetology Schools v. Alexander, 979 F.2d 859, 864 (D.C.Cir.1992) (quoting Neild v. District of Columbia, 110 F.2d 246, 254 (D.C.Cir.1940), in turn quoting Society for Propagating the Gospel v. Wheeler, 22 F.Cas. 756, 767 (C.C.D.N.H.1814) (Story, J.)), and retroactive rulemaking is beyond the Secretary's power, Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).
 
 
 48
 In Georgetown Hospital, the Secretary had issued a rule changing the Medicare program's method for calculating cost limits. Two years later, a federal district court held that the rule had been promulgated in violation of the Administrative Procedure Act. After proper notice and comment, the Secretary readopted the same rule, retroactive to the original date of effectiveness. The Supreme Court unanimously invalidated the Secretary's retroactive action, holding that agencies lack the power to promulgate retroactive legislative rules "unless that power is conveyed by Congress in express terms." Id. at 208, 109 S.Ct. at 472.
 
 
 49
 The government correctly notes that Georgetown Hospital involved a "legislative" rule rather than an "interpretive" one and that except for 42 CFR Sec. 411.25(a), all the rules at issue here are interpretive. Though not claiming explicitly that interpretive rules are exempt from the ban on retroactivity, the government insists that interpretive rules are by nature incapable of having retroactive effect; by definition, it says, they merely reiterate what Congress has already said in a pre-existing statute.
 
 
 50
 We agree with the government--and indeed the appellants do not deny--that the rules whose application is disputed are interpretive. In contrast to the legislative rule at issue in Georgetown Hospital, which was promulgated pursuant to a statutory directive calling for cost limits to be determined "in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs", see 42 U.S.C. Sec. 1395x(v)(1)(A), the MSP rules (other than 42 CFR Sec. 411.25(a)) do not rest on the Medicare Act's delegation of legislative authority to the Secretary; instead, they reflect the Secretary's elucidation of rights and duties created by Congress. See American Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109-10 (D.C.Cir.1993). They obviously are more detailed than the statutory scheme, and they also resolve some ambiguities in the statute. But an interpretation of a statute does not become a legislative rule merely because "it supplies crisper and more detailed lines than the authority being interpreted". Id. at 1112; accord Caraballo v. Reich, 11 F.3d 186, 195 (D.C.Cir.1993) ("While we have said that interpretive rules 'cannot go beyond the text of a statute,' we do not, of course, mean to imply that an interpretive statement may only paraphrase statutory or regulatory language. Indeed, a mere paraphrase would hardly be interpretive at all.") (citation omitted). The dividing line, as we said in American Mining Congress, is whether implementing regulations are necessary in order to make a statutory scheme fully operative: "[A] rule supplying [necessary legislative] action will be legislative no matter how grounded in the agency's 'understanding of what the statute requires', and an interpretation that spells out the scope of an agency's or regulated entity's pre-existing duty ... will be interpretive, even if ... it widens that duty even beyond the scope allowed to the agency under Chevron...." American Mining Cong., 995 F.2d at 1110.
 
 
 51
 It is true that the MSP rules were published in the Code of Federal Regulations, a fact that American Mining Congress said suggested that the prescribing agency likely intended them to have "legal effect" and thus that they were likely to be legislative rather than interpretive. See American Mining Cong., 995 F.2d at 1109, 1112; see also 44 U.S.C. Sec. 1510 (limiting publication in CFR to rules "having general applicability and legal effect"); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 539 (D.C.Cir.1986) (invoking the distinction to divide policy statements from rules). In none of the cases citing the distinction, however, has the court taken publication in the Code of Federal Regulations, or its absence, as anything more than a snippet of evidence of agency intent. See Alaska v. United States Dep't of Transp., 868 F.2d 441, 446 (D.C.Cir.1989); Industrial Safety Equipment Ass'n v. EPA, 837 F.2d 1115, 1121 (D.C.Cir.1988); American Hospital Ass'n v. Bowen, 834 F.2d 1037, 1056 (D.C.Cir.1987); Community Nutrition Inst. v. Young, 818 F.2d 943, 947 n. 8 (D.C.Cir.1987); Telecommunications Research & Action Center v. FCC, 800 F.2d 1181, 1186 (D.C.Cir.1986). Here, the snippet is not enough.
 
 
 52
 But the conclusion that the rules at issue here are interpretive does not in itself legitimate their application to prior transactions. We agree with the government's implicit concession that interpretive rules, no less than legislative rules, are subject to Georgetown Hospital 's ban on retroactivity. The Administrative Procedure Act's definition of a "rule"--"the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ...", 5 U.S.C. Sec. 551(4)--draws no distinction between rules that "interpret" law and rules that "prescribe" law: both must be of "future effect". Cf. Georgetown Hospital, 488 U.S. at 216-23, 109 S.Ct. at 476-79 (Scalia, J., concurring).
 
 
 53
 Where we part company with the government is in its notion that interpretive rules merely echo things "that are already express in the statute". See Appellees' Brief at 48 (emphasis omitted). A rule may be interpretive even though it "interprets" a vague statutory duty or right into a sharply delineated duty or right. American Mining Cong., 995 F.2d at 1112; General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1564 (D.C.Cir.1984) (en banc); American Postal Workers Union v. U.S. Postal Service, 707 F.2d 548, 558-59 (D.C.Cir.1983). Yet the interpretation in a sense changes the legal landscape. Just as a dollar is not exactly the same as a 50-50 chance at two dollars, a precise interpretation is not the same as a range of possible interpretations. Nonetheless, despite the reality of the change, we defer to these agency interpretations.[8] (Indeed, we defer to them even when the agency previously took a contrary view, equally worthy of deference. See, e.g., Mobil Oil Corp. v. EPA, 871 F.2d 149 (D.C.Cir.1989).) When courts review agency action, then, an agency armed with an interpretive rule is in better shape than one whose interpretation of a statute might be denigrated as a mere litigating position. See, e.g.,Georgetown Hospital, 488 U.S. at 212, 109 S.Ct. at 473-74 (citingBurlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)).
 
 
 54
 The government's insistence that interpretive rules add nothing to the statutes that they interpret rests largely on Sentara-Hampton General Hospital v. Sullivan, 980 F.2d 749 (D.C.Cir.1992) (per curiam). There the plaintiff hospital had sued to obtain reimbursement of an interest expense, after HCFA had largely ruled against it in an agency adjudication conducted under 42 U.S.C. Sec. 1395oo(f)(1). The HCFA decision rested in part on interpretations expressed in a 1983 revision of the Medicare Provider Reimbursement Manual. When the case reached this court, we concluded that the 1983 revisions merely interpreted and clarified the existing regulations, and hence were not invalidated by the Secretary's failure to follow notice-and-comment procedures. We acknowledged that the revisions "probably ... made it easier for the Secretary to enforce the regulations", id. at 759, but--emphasizing that the revisions had merely interpreted the existing rules--we concluded that the hospital "did not suffer from the 'retroactive' application of substantive law". Id. at 760 (citing Georgetown Hospital ).
 
 
 55
 In the context of judicial review of internal agency adjudication, as in Sentara-Hampton, it was not meaningful to ask whether the standard that HCFA applied sprang from HCFA's 1983 revisions to the Manual (i.e., its interpretive rule) or from its interpretation of the pre-existing legislative regulations; as the court stressed, there was no difference between the two, for the interpretive rule merely stated HCFA's reading of the old regulations. Even if this reading had been novel, agency interpretations announced in adjudications typically are retroactive, and, subject to some limits, are permissibly so. See generally Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074, 1081-86 (D.C.Cir.1987) (en banc); General American Transp. Corp. v. ICC, 872 F.2d 1048, 1060-61 (D.C.Cir.1989); see also Georgetown Hospital, 488 U.S. at 222, 109 S.Ct. at 478-79 (Scalia, J., noting typically retroactive character of adjudication). Since HCFA was already free to subject Sentara-Hampton to the standard expressed in its 1983 revisions even in the absence of their promulgation as such, the Sentara-Hampton court correctly held that the interpretive rule itself was not being given retroactive effect. To put it another way, any retroactive effect was completely subsumed in the permissible retroactivity of the agency adjudication.
 
 
 56
 Indeed, in the context of internal adjudicatory procedures, to hold that agencies can apply their new interpretations of pre-existing statutes or regulations retroactively only if they do not memorialize those interpretations in interpretive rules would create a perverse disincentive to issue such rules. The ironic result would be that the entities affected by the agency's interpretations would be left more in the dark than before, for clues to the agency's reading of the relevant texts would emerge only on an ad hoc basis. And this even though an ad hoc answer developed in binding agency adjudication would enjoy judicial deference. See, e.g., Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 156-57, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991).
 
 
 57
 Here, however, the statutory scheme calls upon HCFA to seek recovery of conditional payments through a direct action in court, not through internal administrative adjudications. In this context, it is quite meaningful to speak of interpretive rules as having retroactive effect. If the court were to interpret the governing texts in the first instance, unconstrained by an agency interpretation entitled to deference, it might well take a different view of them than the agency. A court that instead defers to interpretive rules promulgated after the transaction at issue is obviously giving those rules retroactive effect.
 
 
 58
 The government correctly observes that in lieu of promulgating the new MSP rules in 1989, "HCFA could have simply begun bringing lawsuits [seeking recovery of conditional payments under the MSP statute], and left it to the courts to decide these issues without the authoritative guide of published regulations." Appellees' Brief at 48. Exactly so. The point is a good indication that HCFA's rules are interpretive, but it does not mean that when HCFA seeks recovery with respect to transactions that occurred before the effective date of the 1989 rules, it can exploit and claim deference for interpretive rules that did not exist when the transactions were conducted. HCFA certainly can bring suits seeking recovery with respect to such transactions, but when it does so it must proceed directly under the MSP statute and whatever pertinent rules were in effect at the time of the transactions. The analyses expressed in the interpretive regulations upheld here should be received with whatever persuasive force they would enjoy if expressed in a brief filed in that litigation.
 
 
 59
 In short, with respect to transactions that occurred before November 13, 1989, HCFA must do precisely what the government proposes: leave it to the courts to make their decisions without deference to the 1989 rules. If the government is correct that the rules add nothing to the MSP statute, then our ruling will be no impediment to the sound implementation of the MSP statute.
 
 IV. Conclusion
 
 60
 To sum up, we agree with the appellants that 42 CFR Secs. 411.24(f) and 411.24(e) go beyond the Secretary's statutory authority and hence are invalid. But we reject the appellants' facial challenges to Secs. 411.32(a)(1), 411.25, and 411.24(i). As for the retroactivity issue, we hold that courts cannot award HCFA recovery out of deference to interpretive rules that did not exist when the transactions at issue were conducted. While the Secretary certainly can try to recover for such transactions under the statutory and regulatory provisions in effect at the time, she cannot draw support from interpretive rules adopted thereafter.
 
 
 61
 Accordingly, the judgment of the district court is
 
 
 62
 Affirmed in part and reversed in part.
 
 
 63
 KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:
 
 
 64
 I join the majority's retroactivity holding as well as its holdings declaring the double payment regulation (42 C.F.R. Sec. 411.24(i)), the mandatory notice regulation (42 C.F.R. Sec. 411.25(a)) and the carve out coverage regulation (42 C.F.R. Sec. 411.32(a)(i)) valid and the claims filing regulation (42 C.F.R. Sec. 411.24(f)) and third-party liability regulation (42 C.F.R. Sec. 411.24(e)) invalid. I write separately, however, because I disagree with the majority's analysis of the third-party liability regulation.
 
 
 65
 HCFA promulgated the regulation setting forth third-party liability, 42 C.F.R. Sec. 411.24(e), as an interpretation of the MSP statute. The majority opinion concludes that the regulation is invalid because it is not a reasonable interpretation of the statute. Majority Opinion at 108-109. While I reach the same result, I would invalidate the regulation because it is inconsistent with the plain text of the MSP statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 
 66
 The MSP statute grants HCFA recourse if it mistakenly pays the health care expenses of an individual covered by both Medicare and an employer group health plan (EGHP). HCFA's erroneous payments are deemed "conditioned on reimbursement," 42 U.S.C. Sec. 1395y(b)(2)(B)(i), if the agency determines that payment for the services "has been or could be made" by a third-party payer pursuant to an EGHP. 42 U.S.C. Sec. 1395y(b)(2)(A)(i). To effectuate HCFA's right of reimbursement, the statute creates a right of action "against any entity which is required or responsible ... to pay ... under a primary plan." 42 U.S.C. Sec. 1395y(b)(2)(B)(ii). HCFA interprets section 1395y(b)(2)(B)(ii) to grant the United States a direct action against "an employer, an insurance carrier, plan, or program, and a third party administrator." 42 C.F.R. Sec. 411.24(e). Its interpretation, however, is inconsistent with the text of the MSP statute because the statute creates a right of action only against those entities "required or responsible ... to pay" health care benefits and a third-party administrator (TPA) does not fall within this category.
 
 
 67
 A TPA is a company that services an employer with a self-insured health plan. Amicus Curiae Brief of the Self-Insurance Institute of America at 10-11. A typical contract between the employer and the TPA obliges the TPA to provide claims-processing and other administrative services to the employer for a fee. See Joint Appendix (J.A.) at 290-98. Customarily, all health care benefits under the EGHP are paid by the TPA from the employer's funds; the TPA does not make any payment with its own money nor does it commingle plan funds with its own funds. Amicus Curiae Brief of the Self-Insurance Institute of America at 12. Under its agreement with a self-insured employer, then, the TPA is not "required or responsible" to pay the medical expenses of individuals covered by the EGHP it administers.
 
 
 68
 Nor does the language of the MSP statute impose a "require[ment]" or "responsib[ility]" on the TPA to pay health care expenses. See United States v. Travelers Ins. Co., 815 F.Supp. 521, 524 (D.Conn.1992) (plain language of statute does not impose additional obligations on TPA); Provident Life & Accident Ins. Co. v. United States, 740 F.Supp. 492, 504 (E.D.Tenn.1990) (plain language of statute creates cause of action against only those entities with ultimate responsibility for payment); United States v. Blue Cross & Blue Shield of Michigan, 726 F.Supp. 1517, 1521-22 (E.D.Mich.1989) (statute's plain text creates right of action only against "those who are responsible to actually make the payments, i.e., the self-insured employer plan itself, and not those who merely undertake to administer the payment process...."). Because the TPA is not obligated to pay health care expenses under either its contract with the employer or the MSP statute and because the right of action created by Congress lies only against an entity obligated to pay, I would invalidate the regulation because it contradicts the "unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 
 69
 The majority believes the statute is ambiguous, and thus open to interpretation by HCFA, because it creates a right of action against an entity not only "responsible" to pay but also "required" to pay. It explains that "[t]hese requirements of course include not only what the employer and employees may have agreed on, but also on the substantive enlargements mandated by the MSP statute itself via its nondiscrimination provisions and its bans on 'taking into account' Medicare coverage." Majority Opinion at 108. From this explication it concludes that the TPA is literally required by the MSP statute to pay for services rendered to Medicare beneficiaries under the plan. Id. It then goes on to invalidate the regulation as an unreasonable interpretation of the statute. But I reject the majority's statutory exegesis and would instead hold that the agency is not free to interpret the plain meaning of the statutory language at all.
 
 
 70
 As the majority points out, the MSP statute expressly alters the insurer's obligations to its insured through at least two provisions. See 42 U.S.C. Sec. 1395y(b)(1)(A)(i)(I) (EGHP may not take into account employee's eligibility for Medicare); 42 U.S.C. Sec. 1395y(b)(1)(A)(i)(II) (EGHP must provide employee age sixty-five or older with same benefits it provides employee under sixty-five). These provisions, however, do not in any way alter the obligations of the TPA to an employee who is covered by the EGHP it administers. Although the majority points to these two statutory provisions as proof positive that the MSP statute enlarges the TPA's responsibilities, it cannot identify any language in the MSP statute that supports its conclusion. Given Congress's explicit grant of a right of action against only those entities responsible or required to pay--which a TPA plainly is not--and in the absence of any language in pari materia indicating otherwise, I would hold the regulation invalid as contrary to the MSP statute's plain text.*
 
 
 71
 MIKVA, Chief Judge, concurring in part and dissenting in part:
 
 
 72
 This court upholds today three of five regulations that the Health Care Financing Administration ("HCFA") promulgated pursuant to the "Medicare as Secondary Payer" ("MSP") statute, 42 U.S.C. Sec. 1395y(b). I dissent from that portion of the majority opinion holding HCFA's third party administrator regulation unreasonable. While I concur in the judgment of the court regarding the impermissible retroactivity of one of the challenged regulations, the reasoning on which I base that judgment differs from that of the majority.
 
 
 73
 A. 42 C.F.R. Sec. 411.24(e): Third Party Administrator Liability
 
 
 74
 The Medicare as Secondary Payer statute authorizes HCFA to recover conditional Medicare payments from "any entity which is required or responsible to pay ... under a primary plan" for services rendered. 42 U.S.C. Sec. 1395y(b)(2)(B)(ii). HCFA construes this statutory provision to include third party administrators ("TPAs"), companies that administer the payment of health care benefits without assuming financial liability for claims filed. 42 C.F.R. Sec. 411.24(e). The majority holds this regulation to be unreasonable; I would uphold the regulation under the deferential standards of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 75
 Due to the "operational realities" of health care payment systems, HCFA often does not know and cannot readily ascertain whether a given insurance company is acting as a conventional insurer or a third party administrator with respect to any given claim. To expedite its recovery of conditional Medicare payments, HCFA includes TPAs as entities "required or responsible to pay" within the meaning of the MSP statute. HCFA's approach is consistent with both the statute's plain language and its underlying purpose. TPAs are literally "required" and "responsible" to pay claims filed under the primary health plans that they administer. Treating TPAs as entities "responsible to pay" facilitates governmental recovery of "conditional" Medicare payments, an underlying purpose of the MSP statute.
 
 
 76
 The majority rejects HCFA's statutory interpretation, explaining that a literal reading of the relevant statutory language proves too much. The majority points out that banks, on which group health plans draw their benefits checks, are also literally "required" and "responsible" to pay for medical services covered by the plans, yet it would be unreasonable to construe the relevant statutory language as extending to them. In my view, the majority glosses over salient differences between banks and third party administrators in the health care payment context that make it reasonable to regard TPAs, but not banks, as entities "required or responsible to pay" within the meaning of the MSP statute.
 
 
 77
 When a health plan draws a benefits check, it effectively orders its bank to pay a specified sum to a designated payee. It delegates no authority to the bank to make discretionary judgments concerning the payment or processing of subscribers' health care claims. TPAs, by contrast, frequently make such judgments on behalf of plans they administer. As sophisticated, repeat players in the health insurance field, TPAs, unlike banks, are often better situated than health plan providers to oversee primary plan compliance with MSP statutory requirements. HCFA cannot readily distinguish those TPAs that exercise such oversight from those whose duties are purely clerical.
 
 
 78
 HCFA's Third Party Administrator Liability regulation is both consistent with the MSP statute's plain language and reasonably calculated to effectuate the statute's underlying purpose. Under Chevron this is sufficient. Notwithstanding the majority's indications to the contrary, determinations of reasonableness do not turn on whether a regulation is "necessary to accomplish Congress's goals." I would uphold the regulation.
 
 B. Retroactivity
 
 79
 Although I concur in the majority's judgment regarding the retroactivity of HCFA's "double payment" regulation, 42 C.F.R. Sec. 411.24(i), I write separately because I neither subscribe to the majority's exposition of Sentara-Hampton General Hosp. v. Sullivan, 980 F.2d 749 (D.C.Cir.1992) (per curiam ) nor distinguish agency from Article III adjudications in analyzing the challenged regulations' retroactivity.
 
 
 80
 Retroactive rulemaking lies beyond the Secretary's power. Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). I agree with the majority that the gravamen of retroactivity is a rule's practical impact, not its "interpretive" or "legislative" label. A rule is retroactive if it "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." Association of Accredited Cosmetology Schools v. Alexander, 979 F.2d 859, 864 (D.C.Cir.1992) (internal citations omitted).
 
 
 81
 Applying this standard to the facts of this case, HCFA's "double payment" regulation, 42 C.F.R. Sec. 411.24(i), is impermissibly retroactive with respect to transactions that occurred prior to November 13, 1993, the regulation's effective date. Prior to adopting its "double payment" regulation, HCFA did not interpret "responsible to pay" to include insurers and self-insured employers who had already paid for the item or service rendered. By construing those "responsible to pay" to include these entities, HCFA's "double payment" regulation marks a sea change in governmental policy. Because the regulation imposes new obligations, duties, and liabilities on these entities, I concur in the majority's judgment that 42 C.F.R. Sec. 411.24(i) cannot apply to payments made before its effective date.
 
 
 82
 The majority reads Sentara-Hampton General Hosp. v. Sullivan, 980 F.2d 749 (D.C.Cir.1992) (per curiam ) to suggest that our holding would be different if HCFA had applied 42 C.F.R. Sec. 411.24(i) in an internal agency adjudication. I read Sentara-Hampton differently. The regulations at issue in that case merely clarified and reaffirmed the reimbursement standard to which HCFA already subjected regulated parties before the Hospital borrowed the funds for which it sought reimbursement. Unlike the regulations at issue in Sentara-Hampton, HCFA's double payment regulation does more than simply clarify an underlying statute or pre-existing policy; it effects a substantive change in the duties and liabilities of regulated parties.
 
 
 83
 HCFA's "third party administrator" regulation, 42 C.F.R. Sec. 411.24(e), also effects a substantive change in the obligations, duties, and liabilities to which TPAs are subject. By the terms of their contracts, TPAs typically do not underwrite the health plans that they administer; they simply process claims filed under health plans for which another entity assumes financial responsibility. Before HCFA promulgated Sec. 411.24(e) in 1989, it had interpreted the statutory reference to those "responsible to pay" to include only entities that assumed financial responsibility for claims filed. By holding third party administrators liable for repayment of conditional Medicare payments, Sec. 411.24(e) imposes new obligations, duties, and liabilities on TPAs. Consequently, the government could not validly apply 42 C.F.R. Sec. 411.24(e) to claims and payments made prior to its effective date.
 
 C. Conclusion
 
 84
 I concur both in the court's analysis of HCFA's "double payment," "Medigap extension," and "mandatory notice" regulations, 42 C.F.R. Secs. 411.24(i), 411.32(a)(1), and 411.25(a), as consistent with the Medicare as Secondary Payer statute and its analysis of HCFA's "claims filing override" regulation, 42 C.F.R. Sec. 411.24(f), as inconsistent with that statute. I too think that HCFA's "double payment" regulation is impermissibly retroactive but so conclude on a different basis than the majority. As to the court's holding that HCFA's "third party administrator" regulation, 42 C.F.R. Sec. 411.24(e), is inconsistent with the Medicare as Secondary Payer statute, I dissent. If the applicability of that regulation were limited to claims or transactions that occurred after the regulation's effective date, I would find the regulation valid.
 
 
 
 [1]
 An employer group health plan is "any plan of, or contributed to by, an employer (including a self-insured plan) to provide health care (directly or otherwise) to the employer's employees, former employees, or the families of such employees or former employees". 42 U.S.C. Sec. 1395y(b)(1)(A)(v); 26 U.S.C. Sec. 5000(b)(1)
 
 
 [2]
 Thus the Fifth Circuit was not technically correct when it said that "the MSP statute has never created or extended coverage; it has only dictated the order of payment when Medicare beneficiaries already have alternate sources of payment for health care." Blue Cross & Blue Shield of Texas v. Shalala, 995 F.2d 70, 73 (5th Cir.1993). While the MSP statute certainly does not require employers to offer group health plans to their employees, it does impose requirements when employers choose to offer such plans. If a plan is written in ways that impermissibly "take account of" beneficiaries' eligibility for Medicare, the MSP statute works to extend the plan's coverage beyond its own terms
 
 
 [3]
 For our purposes, the MSP statute uses the term "primary plans" to mean employer group health plans. Id. Sec. 1395y(b)(2)(A)
 
 
 [4]
 Of course, a third-party payer that does make such a payment, and then is required to reimburse Medicare under Sec. 411.24(i), can attempt to recover its original payment from the recipient
 
 
 [5]
 In some circumstances, HCFA's subrogation rights might conceivably permit it to seek recovery against the beneficiary, provider, or supplier who let the deadline lapse. This case does not present that question and we do not reach it
 
 
 [6]
 The government insists that the district court's misquotation makes no difference, because "the word 'could' may serve as either the past or the present conditional of the word 'can' ". Appellees' Brief at 38 n. 22. But "could have been" is different from "could be". Suppose that ten years ago someone had surgery that would have been covered by his health plan if he had filed a timely claim, but that payment from the plan is no longer available because he never filed a claim. Looking back on his misfortune, he might say, "Payment could have been made under the plan if I had filed a claim", but not, "Payment could be made under the plan if I had filed a claim."
 
 
 [7]
 Contrary to the appellants' suggestion, then, the government is conceding little when it refers to Medigap policies as "a useful form of insurance that many Medicare beneficiaries purchase individually in order to secure more comprehensive coverage than that supplied by Medicare alone." See Appellees' Brief at 23 (emphasis added); cf. Appellants' Reply Brief at 14
 
 
 [8]
 We have often applied Chevron deference to interpretive rules without comment. See, e.g., General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565-67 (D.C.Cir.1984). According to Wagner Seed Co. v. Bush, 946 F.2d 918, 922 (D.C.Cir.1991), "it simply is not the law of this circuit that an interpretive regulation does not receive the Chevron deference accorded a legislative regulation." But cf. National Latino Media Coalition v. FCC, 816 F.2d 785, 788 (D.C.Cir.1987) (dictum quoting Joseph v. United States Civil Serv. Comm'n, 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977), for the proposition that "even though courts often defer to an agency's interpretative rule they are always free to choose otherwise"). Some commentators believe that Chevron deference is appropriate only for "legislative" rules, not "interpretive" ones. See Robert A. Anthony, "Which Agency Interpretations Should Bind Citizens and the Courts?", 7 Yale J.Reg. 1, 55-58 (1990); cf. Michael Herz, "Deference Running Riot: Separating Interpretation and Lawmaking Under Chevron ", 6 Admin.L.J. of Amer.U. 187 (1992). Because the parties have agreed that Chevron deference is appropriate here, we have no need to address the scope of deference to an interpretive rule. Our conclusions about retroactivity, however, would apply as long as courts gave interpretive rules any deference at all
 
 
 *
 That the MSP statute plainly intends to allow recovery only from an insurer finds further support in the language of 42 U.S.C. Sec. 1395y(b)(3)(A), which creates a private cause of action for double damages "in the case of a primary plan which fails to provide for primary payment...." Id. (emphasis added). This language evidences Congress's intent that only the entity that provides a primary plan incur liability. Congress's use of the term "primary plan" instead of "entity," as in 42 U.S.C. Sec. 1395y(b)(2)(B)(ii), is not consistent with an intent to impose liability on an entity whose duties with respect to the plan are ministerial only