BAPTIST MEMORIAL HOSPITAL, Plaintiff–Appellee,

v.

PAN AMERICAN LIFE INSURANCE COMPANY, Defendant–Appellant,

Mississippi Bankers' Association, Trustee of the Mississippi Bankers' Employees Benefit Plan and Trust, Defendant,

Memphis Hospital Service & Surgical Association, Inc., d/b/a Blue Cross/Blue Shield of Memphis, Defendant–Appellee.

No. 93–6404.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1994.

Decided Feb. 1, 1995.

Rehearing Denied March 30, 1995.

---

Michael F. Rafferty, Harris, Shelton, Dunlap & Cobb, Memphis, TN (argued and briefed), for Baptist Memorial Hosp.

Michael F. McBride (argued), Rita M. Theisen (briefed), LeBoeuf, Lamb, Leiby & MacRae, Washington, DC, Albert T. McRae (briefed), Reid R. Phillips, Wilson, McRae, Ivy, Sevier, Mctyier & Strain, Memphis, TN, for Pan American Life Ins. Co.

William L. Bomar (argued and briefed), John I. Houseal, Jr. (briefed), Glanker, Brown, Gilliland, Chase, Robinson & Raines, Memphis, TN, for Memphis Hosp. Service & Surgical Ass'n, Inc.

Before: KENNEDY, MARTIN, and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Appellant Pan American Life Insurance Company provided hospitalization coverage to a man named Horace Thomas, a retired postal worker whose wife was employed as a bank manager. The Pan Am policy was issued to the Mississippi Bankers' Association, an employer group of which the bank where Mr. Thomas' wife worked was a member.

Appellee Memphis Hospital Service & Surgical Association, doing business as Blue Cross/Blue Shield of Memphis, provided hospitalization coverage to Mr. Thomas under an insurance contract (the "Service Benefit Plan") written by the Blue Cross and Blue Shield Association for the Federal Employees Health Benefit Program. Mr. Thomas was also enrolled in Medicare, a government health care program for the elderly.

On February 13, 1990, Mr. Thomas was injured in an automobile accident and was admitted to Baptist Memorial Hospital in Memphis, Tennessee. He remained in the hospital until November 16, 1990, by which time his hospital bill had risen to almost $600,000.

Mr. Thomas assigned his insurance benefits to the hospital on the day of his admission. A year or so later the hospital demanded payment under the Pan Am policy. Pan Am took the position that its contractual obligation to pay the claim was secondary to that of Blue Cross, because the Blue Cross plan covered Mr. Thomas directly and the Pan Am plan covered him only as a dependent. Blue Cross, for its part, took the position that Pan Am's obligation was primary. The hospital brought this lawsuit against the two insurance carriers to obtain a judicial determination as to which of them was the primary payer. Medicare was not joined as a party, and the record does not indicate that the hospital has ever demanded payment from Medicare.

As between Pan Am and Blue Cross, each insurance carrier's policy provides that the Blue Cross coverage is primary to the Pan Am coverage. If Medicare were involved, on the other hand, the Medicare coverage would be secondary to the Pan Am coverage but primary to the Blue Cross coverage. Under the "Medicare as Secondary Payer" statute, 42 U.S.C. § 1395y(b), Medicare cannot be required to pay ahead of Pan Am.

Do the provisions of the statute, and of the regulations adopted under it, abrogate contractual terms that specify who is to provide primary coverage as between Blue Cross and

Pan Am? The district court evidently thought that this question should be answered in the affirmative; on cross-motions for summary judgment, the court entered judgment against Pan Am. It does not appear to us, however, that the statute and implementing regulations affect the contractual arrangements under which Pan Am's coverage is secondary to that of Blue Cross—at least where no claim is being asserted against Medicare. We shall therefore reverse the district court's judgment.

## I

■ Neither Pan Am nor Blue Cross disputes that it would be contractually bound to indemnify Mr. Thomas in the absence of other insurance. Pan Am, however, contends that it has not contracted to pay benefits that are the primary responsibility of another carrier—and as between Pan Am and Blue Cross, Pan Am maintains, Mr. Thomas' hospital bill is the primary responsibility of Blue Cross.

The certificate of insurance that Mr. Thomas' wife received in connection with her employment at the bank supports Pan Am's contention. The certificate, which evidences the issuance of a group insurance policy by Pan Am to the Mississippi Bankers' Association, contains a section captioned "CO–ORDINATION OF BENEFITS WITH OTHER HEALTH PLANS." The first paragraph of this section explains that

"The purpose of group insurance is to help you to pay your medical bills. It is not intended that you receive more in benefits than the medical expenses you incur. Therefore, if you or your dependent are also covered under another 'plan' (as defined below) providing medical or dental benefits and the total benefits that you would receive would exceed the total 'allowable expenses' (as defined below), *the*

*benefits under this Policy will be reduced so that no more than the total amount of 'allowable expenses' incurred by you or your dependent will be paid."* (Emphasis supplied.)

After defining the terms "plan" and "allowable expense," Pan Am's certificate of insurance goes on to provide as follows:

"When a claim is made the primary plan pays its benefits without regard to any other plans. The secondary plans adjust their benefits so that the total benefits available will not exceed the allowable expenses. No plan pays more than it would without the coordination provision.

"A plan without a coordinating provision is always the primary plan. If all plans have such a provision: *(1) the plan covering the patient directly, rather than as an employee's dependent, is primary and the others secondary,* (2) if a child is covered under both parents' plans, the father's is primary, (3) if neither (1) nor (2) apply, the plan covering the patient longest is primary." (Emphasis supplied.)

The Blue Cross plan covers Mr. Thomas directly, rather than as an employee's dependent. If the Blue Cross plan has a coordinating provision, therefore, the italicized language in the last quoted paragraph means that the Blue Cross plan is primary and the Pan Am plan is secondary. (If the Blue Cross plan does not have a coordinating provision, the Blue Cross plan is primary by reason of the first sentence of the last quoted paragraph.)

The Blue Cross plan has not one coordinating provision, as it happens, but two. The first such provision, set forth under the caption **"General Limitations"** on page 7 of the 1990 edition of the brochure containing the Blue Cross contract, appears to cover coordination of benefits between Blue Cross and insurance carriers other than Medicare.[1]

---

1. Under the subheading **"Double Coverage,"** the General Limitations section of the Blue Cross brochure says

"The information in this Section is for subscribers who are not covered by Medicare. For information about coordination of benefits with Medicare, see page 26."

Because Mr. Thomas was covered by Medicare, it is perhaps arguable that the coordination of

benefits provision on page 7 of the brochure has no application to him. If this provision does not apply, there being nothing else in the Blue Cross plan that purports to cover coordination of benefits with anyone other than Medicare, the Blue Cross coverage would be primary, as far as the Pan Am plan is concerned, because "[a] plan without a coordinating provision is always the primary plan." A more sensible reading of the

The second such provision, set forth at page 26 under the caption "**Service Benefit Plan and Medicare**," spells out which plan is primary as between Blue Cross and Medicare.

We turn first to the provision on page 7 of the Blue Cross plan. Under the caption "**Coordination of Benefits**," this provision offers an explanation not unlike the one found in the Pan Am certificate:

> "The Double Coverage provision is intended to prevent payment of benefits which exceed covered expenses. It applies when a person covered by this [Blue Cross] Plan also has, or is entitled to benefits as a result of, any other group health coverage. . . .
>
>    \*    \*    \*    \*    \*    \*
>
> "When there is double coverage, one plan normally pays its benefits in full as the primary payer, and the other plan pays a reduced benefit as the secondary payer. When this Plan is the secondary payer, it will pay the lesser of (1) its benefits in full, or (2) a reduced amount which, when added to the benefits payable by the other plan, will not exceed 100% of the usual, customary and reasonable charge for the service, but never more than would be payable in the absence of double coverage."

The key passage—which is only one sentence long—comes next:

> "The determination of which plan is 'primary' (pays its benefits first) is made according to guidelines provided by the National Association of Insurance Commissioners."

The NAIC guidelines are not quoted in the Blue Cross brochure, but are simply incorporated by reference.

The text of the guidelines said to have been in effect throughout the period of Mr.

Thomas' hospitalization is contained in an attachment to the minutes of a meeting of the "Coordination of Benefits (B) Task Force" of the National Association of Insurance Commissioners held in Kansas City, Missouri on June 11, 1985.[2] The guidelines contain a model coordination of benefits provision for use in group insurance contracts, and it is this provision that was incorporated by reference in the 1990 Blue Cross plan.

Under the caption "ORDER OF BENEFIT DETERMINATION RULES," the NAIC model contract provision says this, in relevant part:

> "This Plan determines its order of benefits using the first of the following rules which applies:
>
> "(i) *Non–Dependent/Dependent.* The benefits of the Plan which covers the person as an employee, member, or subscriber (that is, other than as a dependent) are determined before those of the Plan which covers the person as a dependent."

(Four other rules are then set forth, the last of which says that if none of the preceding rules applies, the plan that has covered the individual for the longer time comes before the plan that has covered him for the shorter time.)

The first rule—the "Non–Dependent/Dependent" rule—clearly applies here; the Blue Cross plan covered Mr. Thomas as a "subscriber," and the Pan Am plan covered him as a "dependent." As between Blue Cross and Pan Am, therefore, the rule provides that Blue Cross is to pay benefits first.

It sometimes happens, of course, that different contracts of insurance contain coordination of benefit provisions that are in conflict with one another. No such conflict is apparent here, at least when Medicare is not being asked to pay. As between Pan Am and Blue Cross, as we have seen, the Pan

---

Blue Cross brochure, we believe, is that the information on page 7 was intended to cover coordination of Blue Cross benefits with benefits under plans other than Medicare, while the information on page 26 was intended to cover coordination of Blue Cross benefits with those under Medicare.

**2.** Copies of the minutes and their attachments have been placed in the record through an affida-

vit executed by John DeCantillon, a Pan Am employee. We do not know when the work of the task force was approved by the commissioners themselves, but Blue Cross has not challenged Mr. DeCantillon's sworn statement that these were the NAIC coordination of benefits guidelines in effect through the end of Mr. Thomas' hospitalization.

Am contract provides that Blue Cross is the primary payer because the Blue Cross plan is the one "covering the patient directly, rather than as an employee's dependent...." The Blue Cross contract, similarly, provides that the obligation of Blue Cross comes first because the Blue Cross plan is the one that "covers the person as [a] ... subscriber (that is, other than as a dependent)...."

## II

If Baptist Memorial Hospital were asserting a claim against Medicare, in addition to asserting claims against Pan Am and Blue Cross, we might have to resolve a possible conflict between the two coordinating provisions of the Blue Cross contract. While the first of these provisions puts benefits under the Blue Cross plan ahead of benefits under the Pan Am plan, the second puts Medicare benefits ahead of Blue Cross benefits—and Medicare, by statute, comes behind Pan Am.

As between Blue Cross and *Medicare*, the Blue Cross brochure tells the subscriber at page 26 that "Medicare is Primary if [among other things] ... [y]ou are an annuitant age 65 or over, covered by Medicare Part A (or Parts A and B) and are not employed by the Federal Government." At the time of his hospitalization Mr. Thomas was an annuitant over age 65, he was covered by Medicare, and he was no longer employed by the federal government. Under the Blue Cross contract, therefore, Mr. Thomas' Medicare coverage was primary to his Blue Cross coverage.

Prior to 1981, the hospital's brief tells us, "Medicare coverage was *generally* primary to coverage under an employee health benefit plan." Brief of appellee Baptist Memorial Hospital, p. 6. (Emphasis supplied.)

> "As a cost-cutting measure, however, Congress eventually enacted a series of amendments designed to make Medicare a 'secondary' payer with respect to such plans. These amendments have been codified at 42 U.S.C. § 1395y(b), which is referred to as the 'Medicare as Secondary

Payer' ('MSP') statute." *Health Ins. Ass'n of America v. Shalala,* 23 F.3d 412, 414 (D.C.Cir.1994).

Under the caption "**Medicare secondary payer,**" 42 U.S.C. § 1395y(b)(2)(A) provides in general that "[p]ayment under [the Medicare] subchapter may not be made ... to the extent that ... payment has been made, or can reasonably be expected to be made ... as required under paragraph (1)...." Paragraph (1), which is captioned "**Requirements of group health plans,**" provides in substance that "when someone age 65 or older is covered by an employer group health plan by reason of his current employment (or the current employment of his spouse), the plan may not 'take into account' that his age entitles him to Medicare benefits." *Health Ins. Ass'n of America,* 23 F.3d at 414, citing 42 U.S.C. § 1395y(b)(1)(A)(i)(I) (1993).[3]

The latter prohibition would affect Pan Am, under the circumstances of the present case, but not Blue Cross. Pan Am covered Mr. Thomas by reason of the current employment of his spouse, so Pan Am was precluded by law from making "the [Pan Am] plan's coverage secondary to Medicare's." *Id.* Blue Cross did not cover Mr. Thomas by reason of his current employment or the current employment of his spouse, so Blue Cross was permitted to make its coverage secondary to Medicare's—and, as we have seen, it did precisely that at page 26 of its brochure.

## III

■ What difference does the MSP statute make as far as priority of payment obligations between Blue Cross and Pan Am is concerned? None at all, in our view, on the facts presented here. In precluding Pan Am from making its coverage secondary to the coverage provided by *Medicare,* Congress did not purport to preclude either Pan Am or Blue Cross from making the Pan Am coverage secondary to the coverage provided by *Blue Cross.*

---

**3.** The text of § 1395y(b)(1)(A)(i)(I) is as follows: "A group health plan—

(I) may not take into account that an individual (or the individual's spouse) who is covered

under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this subchapter under section 426(a) of this title...."

The MSP statute was passed in response to a dramatic increase in Medicare expenditures. By enacting the MSP provisions, "Congress sought to reduce Medicare spending and to insure the continued fiscal integrity of the Medicare program...." *Provident Life and Accident Ins. Co. v. United States,* 740 F.Supp. 492, 495 (E.D. Tenn.1990). Blue Cross argues that the payment of benefits under its plan, which insures active and retired federal employees, has a direct impact on the United States treasury because the Blue Cross plan is "experience rated" and the federal government pays approximately 60 percent of the cost of the program. The implication seems to be that by enacting the MSP provisions Congress sought not only to reduce Medicare spending but to reduce spending by Blue Cross as well.

The argument does not wash. There is no mention of the Federal Employees Health Benefits Program in the MSP statute. The statute relegates Medicare to the status of a "secondary payer"*vis-a-vis* group health plan under which an individual is entitled to benefits by virtue of his current employment status (or that of his spouse), but the statute simply does not say that a Federal Health Benefits Program contractor such as Blue Cross is a secondary payer *vis-a-vis* an insurance carrier that provides coverage by virtue of someone's current employment status.

Neither do the regulations adopted under the MSP statute, 42 C.F.R. § 411.72, address the question of who must pay first as between two non-Medicare insurance plans. The regulations, as quoted by Blue Cross in its brief, provide as follows:

"(a) *Conditions the individual must meet.* Medicare Part A and Part B benefits are secondary to benefits payable by an employer plan for services furnished during any month in which the individual—

(1) Is aged; ...

(4) Meets one of the following conditions:

(i) is *employed and covered,* by reason of that employment, under an employer plan.

(ii) Is the *aged spouse* of an *employed individual who*—

(c) For services furnished after April 30, 1986 was, at the time the services were furnished, *any age.*" (Emphasis by Blue Cross.)

As applied to the instant situation, this simply means that Medicare benefits are secondary to benefits payable under the insurance contract between Pan Am and the Mississippi Bankers' Association. The regulations are silent on the question whether Pan Am benefits are secondary to Blue Cross benefits or vice versa. That question is left to the contracts themselves—and both contracts, as shown above, provide that the Pan Am benefits are secondary to the Blue Cross benefits.[4]

Contracts entered into subsequent to 1990 apparently contain different provisions. Through the affidavit of Robert Flohr, an employee of the Blue Cross and Blue Shield Association, Blue Cross has shown that the National Association of Insurance Commissioners changed its coordination of benefits rules in 1990[5] to carve out an exception to the "Non–Dependent/Dependent" rule. The exception provides that

"regardless of the coordination of benefits arrangements between the plans." It is clear that the manual is concerned only with Medicare's liability and not with coordination of benefits provisions that do not purport to make Medicare the primary payer in violation of law. The manual even provides an illustrative example in which it says that "the retirement plan may choose to coordinate benefits with the employed spouse's [plan] so that the combined benefit of the two plans is primary to Medicare."

**4.** The opinion of the district court refers to a "Medicare Intermediaries Manual" in which the Health Care Financing Administration (the agency that administers the Medicare program) addresses the issue of Medicare liability where an individual covered by Medicare also has coverage under more than one employer group health plan. The manual stresses that private agreements "cannot supersede Federal law that makes Medicare secondary payer to certain [employer group plans];" therefore, the manual goes on to say, where an individual has private coverage based on current employment in addition to private coverage as a retiree, Medicare is secondary to the former coverage and primary to the latter

**5.** The change was adopted in December, after Mr. Thomas' hospitalization had ended.

"If the person is also a Medicare beneficiary, and as a result of the rule established by Title XVIII of the Social Security Act and implementing regulations, Medicare is (a) Secondary to the plan covering the person as a dependent and (b) Primary to the plan covering the person as other than a dependent (e.g. a retired employee), then benefits of the plan covering the person as a dependent are determined before those of the plan covering that person as other than a dependent."

By adding this exception, the NAIC resolved the circularity problem that would otherwise have existed where a claimant was seeking to recover hospital expenses both from Medicare and from more than one private insurance carrier.

Even before adoption of the change by the NAIC, Mr. Flohr's affidavit says, Blue Cross and other insurers (not identified in the affidavit) "consistently coordinated benefits with other carriers based on the same order as was subsequently adopted by the NAIC." Obviously, however, a change in the terms of contracts entered into after Mr. Thomas' hospitalization cannot change the contracts that were in effect when the hospitalization occurred. Both of the two contracts in force when Mr. Thomas was hospitalized contained a "Non–Dependent/Dependent" rule, and neither contract recognized a Medicare exception to that rule. If Blue Cross and other insurers were coordinating benefits under their 1990 contracts as if such an exception had already been adopted—which is what Blue Cross wants to do with Pan Am here— such a practice cannot serve as a practical construction indicative of the intended meaning of the contracts with which we are concerned in this case absent a showing that Pan Am was coordinating benefits in the same way. No such showing has been made.

Blue Cross argues that what the contracts said in 1990 about coordination of benefits between Pan Am and Blue Cross had been made irrelevant by Congress. Congress had permitted Blue Cross to specify that the Blue Cross coverage would be secondary to Medicare's, the argument runs, and Blue Cross had done so. Congress had required that

Medicare's coverage be secondary to Pan Am's, on the other hand, and had precluded Medicare from paying ahead of Pan Am. As a matter of Aristotelian logic, Blue Cross suggests, it follows that Congress had made the Blue Cross coverage secondary to the Pan Am coverage.

The argument does not persuade us. Medicare has no dog in this particular fight. Medicare has never been asked to pay anything, as far as we know, and has not been made a party to the lawsuit. Congress manifested no interest whatever in who would pay first as between private insurance carriers such as Pan Am and Blue Cross. The sole interest of Congress, as far as the statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations. Where that interest is not affected—and it does not seem to be here—we see no reason why the pertinent contractual provisions should not be enforced in accordance with their terms.

IV

Where a hospitalization plan that is primary to Medicare under the MSP statute fails to provide for primary payment in accordance with the statute, a private cause of action exists for damages "in an amount double the amount otherwise provided." 42 U.S.C. § 1395y(b)(3)(A). The district court applied this provision here, entering judgment for the hospital against Pan Am in an amount equal to twice the amount of the hospital expenses.

Because we conclude that Blue Cross was the primary payer as between itself and Pan Am, we need not decide whether Pan Am would be liable for double damages if it were the primary payer. As far as Blue Cross is concerned, it is liable for damages in the full amount it contracted to pay and no more. The double damage provision applies only in the case of a plan that is *primary* to Medicare, in accordance with 42 U.S.C. §§ 1395y(b)(1) and (2)(A), and Blue Cross is *secondary* to Medicare. Blue Cross clearly cannot be held liable for double damages.

The judgment of the district court is **REVERSED**, and the case is **REMANDED** to

the district court for entry of judgment against Memphis Hospital Service & Surgical Association, Inc., d/b/a Blue Cross/Blue Shield of Memphis, in an amount not inconsistent with this opinion.